Reversed by published opinion. Judge WILKINS wrote the majority, opinion, in which Judges WIDENER, NIEMEYER, LUTTIG, WILLIAMS, TRAXLER, and HAMILTON joined. Judge LUTTIG wrote a concurring opinion; Judge HAMILTON wrote a concurring opinion; and Chief Judge WILKINSON wrote an opinion concurring in the judgement. Judge MURNAGHAN wrote a dissenting opinion, in which Judges MICHAEL, DIANA GRIBBON MOTZ and KING joined.
OPINION
WILKINS, Circuit Judge:
Appellees, six professors employed by various public colleges and universities in Virginia, brought this action challenging the constitutionality of a Virginia law restricting state employees from accessing sexually explicit material on computers that are owned or leased by the state.[1] See Va.Code Ann. §§ 2.1-804 to -806 (Michie Supp.1999) (the Act). The district court granted summary judgment in favor of Appellees, reasoning that the Act unconstitutionally infringed on state employees' First Amendment rights. See Urofsky v. Allen, 995 F.Supp. 634 (E.D.Va.1998). A panel of this court reversed that decision, holding that our prior en banc opinion in Boring v. Buncombe County Board of Education, 136 F.3d 364, 368-69 (4th Cir.1998)’ (en banc), compelled the conclusion that the restriction on state employees’ access to sexually explicit material on computers owned or leased by the state is constitutional because the Act regulates only state employees’ speech in their capacity as state employees, as opposed to speech in their capacity as citizens addressing matters of public concern. See Urofsky v. Gilmore, 167 F.3d 191 (4th Cir.1999). A majority of the active circuit judges thereafter voted to hear this appeal en banc. We now hold that the regulation of state employees’ access to sexually explicit material, in their capacity as employees, on computers owned or leased by the state is consistent with the First Amendment. Accordingly, we reverse the decision of the district court.
I.
The central provision of the Act states: Except to the extent required in conjunction with a bona fide, agency-approved research project or other agency-approved undertaking, no agency employee shall utilize agency-owned or agency-leased computer equipment to access, download, print or store any information infrastructure files or services having sexually explicit content. Such agency approvals shall be given in writing by agency heads, and any such approvals shall be available to the public under the provisions of the Virginia Freedom of Information Aet[,” Va.Code Ann. §§ 2.1-340.1 to -346.1 (Michie Supp.1999) ].
Va.Code Ann. § 2.1-805.[2] Another section of the Act defines “sexually explicit content.” When the district court ruled, and when the panel initially considered this *405 appeal, the Act defined “sexually explicit content” to include:
(i) any description of or (ii) any picture, photograph, drawing, motion picture film, digital image or similar visual representation depicting sexual bestiality, a lewd exhibition of nudity, as nudity is defined in § 18.2-390, sexual excitement, sexual . conduct or sadomasochistic abuse, as also defined in § 18.2-390, co-prophilia, urophilia, or fetishism.
Va.Code Ann. § 2.1-804 (Michie Supp. 1998). Following our panel decision, the Virginia General Assembly amended the definition of “sexually explicit content” to add the italicized language:
content having as a dominant theme (i) any lascivious description of or (ii) any lascivious picture, photograph, drawing, motion picture film, digital image or similar visual representation depicting sexual bestiality, a lewd exhibition of nudity, as nudity is defined in § 18.2-390, sexual excitement, sexual conduct or sadomasochistic abuse, as also defined in § 18.2-390, coprophilia, urophilia, or fetishism.
Va.Code Ann. § 2.1-804 (Michie Supp. 1999) (emphasis added).[3]
As its language makes plain, the Act restricts access by state employees to lascivious sexually explicit material on computers owned or leased by the state. But, the Act does not prohibit all access by state employees to such materials, for a state agency head may give permission for a state employee to access such information on computers owned or leased by the state if the agency head deems such access to be required in connection with a bona fide research project or other undertaking. Further, state employees remain free to access sexually explicit materials from their personal or other computers not owned or leased by the state. Thus, the Act prohibits state employees from accessing sexually explicit materials only when the employees are using computers that are owned or leased by the state and permission to access the material has not been given by the appropriate agency head.
None of the Appellees has requested or been denied permission to access sexually explicit materials pursuant to the Act. Indeed, the record indicates that no request for access to sexually explicit materials on computers owned or leased by the state has been declined.[4]
Appellees maintain that the restriction imposed by the Act violates the First Amendment rights of state employees. Appellees do not assert that state employees possess a First Amendment right to access sexually explicit materials on state-owned or leased computers for their personal use; rather, Appellees confine their challenge to the restriction of access to *406 sexually explicit materials for work-related purposes. Appellees’ challenge to the Act is twofold: They first maintain that the Act is unconstitutional as to all state employees; failing this, they argue more particularly that the Act violates academic employees’ right to academic freedom.
II.
It is well settled that citizens do not relinquish all of their First Amendment rights by virtue of accepting public employment. See United States v. National Treasury Employees Union, 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) [hereinafter NTEU]; Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Nevertheless, the state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole. See Waters v. Churchill, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) (recognizing that “the government as employer ... has far broader powers than does the government as sovereign”); Pickering, 391 U.S. at 568, 88 S.Ct. 1731 (explaining that “the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general”). A determination of whether a restriction imposed on a public employee’s speech violates the First Amendment requires “ ‘a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.’ ” Connick, 461 U.S. at 142, 103 S.Ct. 1684 (alteration in original) (quoting Pickering, 391 U.S. at 568, 88 S.Ct. 1731). This balancing involves an inquiry first into whether the speech at issue was that of a private citizen speaking on a matter of public concern. If so, the court must next consider whether the employee’s interest in First Amendment expression outweighs the public employer’s interest in what the employer has determined to be the appropriate operation of the workplace. See Pickering, 391 U.S. at 568, 88 S.Ct. 1731.
The threshold inquiry thus is whether the Act regulates speech by state employees in their capacity as citizens upon matters of public concern. If a public employee’s speech made in his capacity as a private citizen does not touch upon a matter of public concern, the state, as employer, may regulate it without infringing any First Amendment protection.[5] See Connick, 461 U.S. at 146, 103 S.Ct. 1684 (explaining that if a plaintiffs speech “cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary ... to scrutinize the reasons for [the] discharge”); Holland v. Rimmer, 25 F.3d 1251, 1254-55 & n. 11 (4th Cir.1994). Whether speech is that of a private citizen addressing a matter of public concern is a question of law for the court and, accordingly, we review the matter de novo. See Connick, 461 U.S. at 148 n. 7, 103 S.Ct. 1684; Hall v. Marion Sch. Dist. Number 2, 31 F.3d 183, 192 (4th Cir.1994); Holland, 25 F.3d at 1255.
To determine whether speech involves a matter of public concern, we examine the content, context, and form of the speech at issue in light of the entire record. See Connick, 461 U.S. at 147-48, 103 S.Ct. 1684. Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a com *407 munity. See id. at 146, 103 S.Ct. 1684. An inquiry into' whether a matter is of public concern does not involve a determination of how interesting or important the subject of an employee’s speech is. See Terrell v. University of Tex. Sys. Police, 792 F.2d 1360, 1362 (5th Cir.1986). Further, the place where the speech occurs is irrelevant: An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace. Compare Rankin v. McPherson, 483 U.S. 378, 388-92, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (holding public employee’s' discharge was violative of First Amendment when based on comment by employee as a private citizen on a matter of public concern made at work), with DiMeglio v. Haines, 45 F.3d 790, 805 (4th Cir.1995) (recognizing that speech by a public employee outside the workplace was made in the employee’s official capacity).
The Supreme Court has made clear that the concern is to maintain for the government employee the same right enjoyed by his privately employed counterpart. To this end, in its decisions determining speech to be entitled to First Amendment protection the Court has emphasized the unrelatedness of the speech at issue to the speaker’s employment duties. See NTEU, 513 U.S. at 465, 115 S.Ct. 1003 (concluding that balancing test applied to employees’ “expressive activities in their capacity as citizens, not as Government employees” and noting that “[wjith few exceptions, the content of [employees’] messages [had] nothing to do with their jobs”); id. at 466, 115 S.Ct. 1003 (emphasizing that the Court has applied the Pickering balancing test “only when the employee spoke as a citizen upon matters of public concern rather than as an employee upon matters only of personal interest”); id. at 480, 115 S.Ct. 1003 (O’Connor, J., concurring in the judgment in part and dissenting in part) (agreeing that balancing test was appropriate because restriction applied only to “off-hour speech bearing no nexus to Government employment”); Pickering, 391 U.S. at 574, 88 S.Ct. 1731 (explaining that when-“the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication- made by [the employee], ... it is necessary to regard the [employee] as the member of the general public he seeks to be”). Thus, critical to a determination of whether employee speech is entitled to First Amendment protection is whether the spéech is “made primarily in the [employee’s] role as citizen or primarily in his role as employee.” Terrell, 792 F.2d at 1362; see Boring, 136 F.3d at 368-69 (holding that the selection of a play by a high school drama teacher did not involve a matter of public concern because the choice was made by the teacher in her capacity as a teacher in a matter dealing with curriculum); Holland, 25 F.3d at 1255-56 (concluding that speech by supervisor disciplining subordinates was not speech as private citizen on matters of public concern because it constituted “in-house communications between employees speaking as employees ”); see also DiMeglio, 45 F.3d at 805 (noting that “the [Supreme] Court [has] distinguished between speaking as a citizen and as an employee, and [has] focused on speech as a citizen as that for which constitutional protection is afforded”).
This focus on the capacity of the speaker recognizes the basic truth that speech by public employees undertaken in the course of their job duties will frequently involve matters of vital concern to the public, without giving those employees a First Amendment right to dictate to the state how they will do their jobs. For example, suppose an assistant district attorney, at the District Attorney’s direction, makes a formal statement to the press regarding an upcoming murder trial — a matter that is unquestionably of concern to the public. It cannot seriously be doubted that the assistant does not possess a First Amendment right to challenge his employ *408 er's instructions regarding the content of the statement.[6] In contrast, when the same assistant district attorney writes a letter to the editor of the local newspaper to expose a pattern of prosecutorial malfeasance, the speech is entitled to constitutional protection because it is made in the employee's capacity as a private citizen and touches on matters of public concern.
Judge Wilkinson and Judge Murnaghan fail to recognize the importance of the role of the speaker in determining whether speech by a public employee is entitled to First Amendment protection. Under their respective analyses, the assistant district attorney in the above hypothetical would have a First Amendment right to challenge his employer's directions regarding the press conference.[7] It is difficult to imagine the array of routine employment decisions that would be presented as constitutional questions to this court under this view of the law. See Connick, 461 U.S. at 143, 103 S.Ct. 1684 (recognizing that "government offices could not function if every employment decision became a constitutional matter").
The speech at issue here-access to certain materials using computers owned or leased by the state for the pur *409 pose of carrying out employment duties— is clearly made in the employee’s role as employee. Therefore, the challenged aspect of the Act does not regulate the speech of the citizenry in general, but rather the speech of state employees in their capacity as employees. It cannot be doubted that in order to pursue its legitimate goals effectively, the state must retain the ability to control the manner in which its employees discharge their duties and to direct its employees to undertake the responsibilities of their positions in a specified way. Cf. Waters, 511 U.S. at 675, 114 S.Ct. 1878 (explaining that restrictions on speech may be necessary when “the government is employing someone for the very purpose of effectively achieving its goals”); id. at 672, 114 S.Ct. 1878 (noting that “even many of the most fundamental maxims of ... First Amendment jurisprudence cannot reasonably be applied to speech by government employees”); Connick, 461 U.S. at 143, 103 S.Ct. 1684 (acknowledging that “government offices could not function if every employment decision became a constitutional matter”). The essence of Appellees’ claim is that they are entitled to access sexually explicit material in their capacity as state employees by using equipment owned or leased by the, state. Because, as Appellees acknowledge, the challenged aspect of the Act does not affect speech by Appellees in their capacity as private citizens speaking on matters of public concern, it does not infringe the First Amendment rights of state employees.
III.
Alternatively, Appellees maintain that even if the Act is valid as to the majority of state employees it violates the First Amendment academic freedom rights of professors at state colleges and universities,[8] and thus is invalid as to them.[9] In essence, Appellees contend that a university professor possesses a constitutional right to determine for himself, without the input of the university (and perhaps even *410 contrary to the university’s desires), the subjects of his research, writing, and teaching. Appellees maintain that by requiring professors to obtain university approval before accessing sexually explicit materials on the Internet in connection with their research, the Act infringes this individual right of academic freedom. Our review of the law, however, leads us to conclude that to the extent the Constitution recognizes any right of “academic freedom” above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors, and is not violated by the terms of the Act.
“Academic freedom” is a term that is often used, but little explained, by federal courts. See W. Stuart Stuller, High School Academic Freedom: The Evolution of a Fish Out of Water, 77 Neb. L.Rev. 301, 302 (1998) (“[C]ourts are remarkably consistent in their unwillingness to give analytical shape to the rhetoric of academic freedom.”); see also J. Peter Byrne, Academic Freedom: A “Special Concern of the First Amendment” 99 Yale L.J. 251, 253 (1989) (“Lacking definition or guiding principle, the doctrine [of academic freedom] floats in the law, picking up decisions as a hull does barnacles.”). As a result, decisions invoking academic freedom are lacking in consistency, see Stuller, supra, at 303, and courts invoke the doctrine in circumstances where it arguably has no application, see Byrne, supra, at 262-64. Accordingly, we begin with a brief review ,of the history of the concept of academic freedom in the United States.
Prior to the late nineteenth century, institutions of higher education in this country were not considered centers of research and scholarship, but rather were viewed as a means of passing received wisdom on to the next generation. See Richard Hofstadter & Walter P. Metzger, The Development of Academic Freedom in the United States 278-79 (1955); Stuller, supra, at 307-08. “Faculty performed essentially fixed if learned operations within a traditional curriculum under the sanction of established truth.... [AJcademic freedom as we know it simply had no meaning.” Byrne, supra, at 269. Additionally, American universities during this period were characterized by “legal control by non-academic trustees; effective governance by administrators set apart from the faculty by political allegiance and professional orientation; [and] dependent and insecure faculty.” Id. at 268-69. This began to change, however, as Americans who had studied at German universities sought to remodel American universities in the German image. See Walter P. Metz-ger, Profession and Constitution: Two Definitions of Academic Freedom in America, 66 Tex. L.Rev. 1265, 1269 (1988).
The German notion of academic freedom was composed primarily of two concepts: Lehrfreiheit and Lemfreiheit. See generally Hofstadter & Metzger, supra, at 386-91 (discussing German understanding of academic freedom). Lehofreiheit, or freedom to teach, embodied the notion that professors should be free to conduct research and publish findings without fear of reproof from the church or state; it further denoted the authority to determine the content of courses and lectures. See id. at 386-87. Lemfreiheit was essentially a corollary right of students to determine the course of their studies for themselves. See id. at 386.
In 1915, a committee of the American Association of University Professors (AAUP) issued a report on academic freedom that adapted the concept of Lehrfreiheit to the American university. See generally Metzger, supra, at 1267-85 (examining the factors influencing the AAUP’s definition of academic freedom). In large part, the AAUP was concerned with obtaining for professors a measure of professional autonomy from lay administrators and trustees.[10] See Byrne, supra, *411 at 273-78; Metzger, supra, at 1275-76. The AAUP defined academic freedom as “a right claimed by the accredited educator, as teacher and investigator, to interpret his findings and to communicate his conclusions without being subjected to any interference, molestation, or penalization because the conclusions are unacceptable to some constituted authority within or beyond the institution.” Stuller, supra, at 309 (internal quotation marks omitted).[11] Significantly, the AAUP conceived academic freedom as a professional norm, not a legal one: The AAUP justified academic freedom on the basis of its social utility as a means of advancing the search for truth, rather than its status as a manifestation of First Amendment rights. See Hofstadter & Metzger, supra, at 398-400; Byrne, supra, at 277-78. The principles adopted in the 1915 report were later codified in a 1940 Statement of Principles on Academic Freedom and Tenure promulgated by the AAUP and the Association of American Colleges. See Richard H. Hiers, Academic Freedom in Public Colleges and Universities: O Say, Does that Star-Spangled First Amendment Banner: Yet Wave?, 40 Wayne L.Rev. 1, 4-5 (1993). The 1940 Statement since “has been endorsed by every major higher education organization in the nation,” Byrne, supra, at 279, “through its adoption into bylaws, faculty contracts, and collective bargaining agreements,” Amy H. Candido, Comment, A Right to Talk Dirty?: Academic Freedom Values and Sexual Harassment in the University Classroom, 4 U. Chi. L. Seh. Roundtable 85, 86-87 (1996-97).[12]
Appellees’ insistence that the Act violates their rights of academic freedom amounts to a claim that the academic freedom of professors is not only a professional norm,- but also a constitutional right.[13] We disagree. It is true, of course, that homage has been paid to the ideal of academic freedom in a number of Supreme Court opinions, often with reference to the *412 First Amendment. See, e.g., Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 226 & n. 12, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 312-13, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.); Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion); id. at 261-63, 77 S.Ct. 1203 (Frankfurter, J., concurring in the result). Despite these accolades, the Supreme Court has never set aside a state regulation on the basis that it infringed a First Amendment right to academic freedom. Cf. Minnesota State Bd. for Community Colleges v. Knight, 465 U.S. 271, 287, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984) (stating that the Court has not recognized a First Amendment right of faculty to participate in academic policy-making).
Moreover, a close examination of the cases indicates that the right praised by the Court is not the right Appellees seek to establish here. Appellees ask us to recognize a First Amendment right of academic freedom that belongs to the professor as an individual. The Supreme Court, to the extent it has constitutionalized a right of academic freedom at all, appears to have recognized only an institutional right of self-governance in academic affairs.
We begin our examination of the cases with Sweezy, in which Appellees claim “[t]he Supreme Court first adopted the principle of academic freedom.” Brief of the Appellees at 21. Sweezy arose from an investigation of “subversive activities” by the New Hampshire Attorney General. Paul Sweezy, a target of the investigation, refused to answer certain questions regarding a guest lecture he had given at the University of New Hampshire. His refusal to answer these and other questions ultimately resulted in his incarceration for contempt. On certiorari review of the decision of the New Hampshire Supreme Court affirming the conviction, a plurality of four justices indicated that the action of the state “unquestionably” infringed Sweezy’s “liberties in the areas of academic freedom and political expression.” Sweezy, 354 U.S. at 250, 77 S.Ct. 1203.
The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.
Id. This paean to academic freedom notwithstanding, the plurality did not vacate Sweezy’s contempt conviction on First Amendment grounds, but rather concluded that because the Attorney General lacked authority to investigate Sweezy, the conviction violated due process. See id. at 254-55, 77 S.Ct. 1203.
Justice Frankfurter, who along with Justice Harlan provided the votes necessary to reverse, relied explicitly on academic freedom in concluding that Sweezy’s contempt conviction offended the Constitution. The right recognized by Justice Frankfurter, however, was not the individual right claimed by Appellees, but rather an institutional right belonging to the University of New Hampshire: “When weighed against the grave harm resulting from governmental intrusion into the intellectual life of a university, [the] justification for compelling a witness to discuss the contents of his lecture appears grossly in *413 adequate.” Id. at 261, 77 S.Ct. 1203 (Frankfurter, J., concurring in the result) (emphasis added). Justice Frankfurter emphasized “the dependence of a free society on free universities” and concluded by enumerating “the four essential freedoms of a university — to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.” Id. at 262-63, 77 S.Ct. 1203 (internal quotation marks omitted). Significantly, at no point in his concurrence does Justice Frankfurter indicate that individual academic freedom rights had been infringed; in his view, the constitutional harm fell entirely on the university as an institution.[14]
In light of this review of the actual holding and rationale in Sweezy, it is difficult to understand how that case can be viewed as clearly “adopting” any academic freedom right, much less a, right of the type claimed by Appellees. At best, it can be said that six justices agreed that the First Amendment protects Values of academic freedom. However, the justices were plainly of very different minds as to the nature of this “right.” ' And, even if Sweezy could be read as creating an individual First Amendment right of academic freedom, such a holding would not advance Appellees’ claim of a First Amendment right pertaining to their work as scholars and teachers because Sweezy involved only the right of an individual to speak in his capacity as a private citizen. See id. at 249, 77 S.Ct. 1203 (explaining that “[t]he sole basis for the inquiry was to scrutinize [Sweezy] as a person,” not as a teacher).
Several other cases decided at roughly the same time as Sweezy involved restrictions on state employees’ rights as private citizens to speak and associate! See, e.g., Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967) (loyalty oath required of publicly employed teachers); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (affidavit listing organizational membership required of teachers at state-funded educational institutions); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (loyalty oath required of state employees). Although the Court discussed the infringement of the state act on academic freedom in two of the cases, see Whitehill, 389 U.S. at 59-60, 88 S.Ct. 184; Shelton, 364 U.S. at 487, 81 S.Ct. 247, and all of the actions were brought by teachers, in none of them did the Court base its holding-on academic freedom, see Whitehill, 389 U.S. at 59-62, 88 S.Ct. 184 (striking down provision on basis of overbreadth); Shelton, 364 U.S. at 490, 81 S.Ct. 247 (same); Wieman, 344 U.S. at 190-92, 73 S.Ct. 215 (declaring statute unconstitutional as violative of due process).'
Even if Whitehill, Shelton, and Wieman could be said to have established a constitutional right of academic freedom enjoyed by publicly employed teachers, such a holding would be of little significance in light of the historical context. As late as March 1952, mere months before Wieman was decided, the Supreme Court had adhered to the principle that public employment was a privilege, not a right, and thus could be conditioned on restrictions on the exercise of constitutional rights by individuals in their capacities as private citizens. See Adler v. Board of Educ., 342 U.S. 485, 492, 72 S.Ct. 380, 96 L.Ed. 517 (1952) (rejecting argument by public school teacher that statute and regulations disqualifying from employment individuals who belonged to certain organizations violated First Amendment rights). By 1956, however, the Court had begun to back *414 away from this position. See Slochower v. Board of Higher Educ., 350 U.S. 551, 555, 558-59, 76 S.Ct. 637, 100 L.Ed. 692 (1956) (holding that dismissal of professor, pursuant to statute that required termination of any public employee who invoked Fifth Amendment right against self-incrimination to avoid a question related to official conduct, violated due process; observing that “[t]o state that a person does not have a constitutional right to government employment is only to say that he must comply with reasonable, lawful, and nondis-eriminatory terms laid down by the proper authorities”). And, by 1967, the. Court had rejected it altogether. See Keyishian, 385 U.S. at 605-06, 87 S.Ct. 675; see also Elrod v. Burns, 427 U.S. 347, 358-59, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (opinion of Brennan, J.) (“Keyishian squarely held that political association alone could not, consistently with the First Amendment, constitute an adequate ground for denying public employment.”). Indeed, it is now beyond question that a public employer does not enjoy carte blanche to sanction employees for the exercise of First Amendment rights. See Rankin, 483 U.S. at 383-84, 107 S.Ct. 2891. Therefore, to the extent that Whitehill, Shelton, and Wieman may have held that a publicly employed teacher may not be disciplined for the exercise of First Amendment rights as a private citizen, that holding has been subsumed by later cases extending the same protection to all public employees.
Other cases that have referred to a First Amendment right of academic freedom have done so generally in terms of the institution, not the individual. For example, in Keyishian the Court considered a renewed challenge to a New York statute and regulations, certain provisions of which were upheld in Adler, designed “to prevent the appointment or retention of ‘subversive’ persons in state employment.” Keyishian, 385 U.S. at 592, 87 S.Ct. 675. Keyishian, like the cases discussed above, involved the right of a professor to speak and associate in his capacity as a private citizen, and thus is not germane to Appel-lees’ claim. Moreover, in the course of reaching its conclusion that the provisions were unconstitutionally vague, the Court discussed the detrimental impact of such laws on academic freedom, which the Court characterized as “a special concern of the First Amendment.” Id. at 603, 87 S.Ct. 675. The discussion by the Court indicates, however, that it was not focusing on the individual rights of teachers, but rather on the impact of the New York provisions on schools as institutions: The vice of the New York provisions was that they impinged upon the freedom of the university as an institution. See University of Pa. v. EEOC, 493 U.S. 182, 198, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (noting that Keyishian was a case involving governmental infringement on the right of an institution “to determine for itself on academic grounds who may teach” (internal quotation marks omitted)).
This emphasis on institutional rights is particularly evident in more recent Supreme Court jurisprudence. For example, in Bakke Justice Powell discussed academic freedom as it related to a program of admissions quotas established by a medical school. Relying on Keyishian and on Justice Frankfurter’s concurrence in Sweezy, Justice Powell characterized academic freedom as “[t]he freedom of a university to make its own judgments as to education.” Bakke, 438 U.S. at 312, 98 S.Ct. 2733 (opinion of Powell, J.). Similarly, in Ewing the Court described academic freedom as a concern of the institution. See Ewing, 474 U.S. at 226, 106 S.Ct. 507.
Significantly, the Court has never recognized that professors possess a First Amendment right of academic freedom to determine for themselves the content of their courses and scholarship, despite opportunities to do so. For example, in Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Court considered a challenge to a state law that *415 prohibited the teaching of evolution. The Churt repeated its admonition in Keyishi-an that “the First Amendment ‘does not tolerate laws that cast a pall of orthodoxy-over the classroom,’ ” Epperson, 393 U.S. at 105, 89 S.Ct. 266 (quoting Keyishian, 385 U.S. at 603, 87 S.Ct. 675), but nevertheless declined to invalidate the statute on the basis that it infringed the teacher’s right of academic freedom.[15] Rather, the Court held that the provision violated the Establishment Clause. See id. at 106-09, 87 S.Ct. 675. Almost twenty years later, the opportunity to create an individual First Amendment right of academic freedom again arose in Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), another case involving limitations on public school teachers’ authority to teach evolution. In Edwards, a state statute required that instruction on evolution be accompanied by teaching on creation science. As in Epperson, the Court decided the case on Establishment Clause grounds. See Edwards, 482 U.S. at 596-97, 107 S.Ct. 2573. This time, however, the Court did not even mention academic freedom as a relevant consideration in holding the statute unconstitutional.[16]
Taking all of the cases together, the best that can be said for Appellees’ claim that the Constitution protects the academic freedom of an individual professor is that teachers were the first public employees to be afforded the now-universal protection against dismissal for the exercise of First Amendment rights. Nothing in Supreme Court jurisprudence suggests that the “right” claimed by Appellees extends any further. Rather, since declaring that public employees, including teachers, do not forfeit First Amendment rights upon accepting public employment, the Court has focused its discussions of academic freedom solely on issues of institutional autonomy. We therefore conclude that because the Act does not infringe the constitutional rights of public employees in general, it also does not violate the rights of professors.[17]
*416 IV.
We reject the conclusion of the district court that Va.Code Ann. §§ 2.1-804 to -806, prohibiting state employees from accessing sexually explicit material on computers owned or leased by the state except in conjunction with an agency-approved research project, infringes upon the First Amendment rights of state employees. We further reject Appellees’ contention that even if the Act is constitutionally valid as to the majority of state employees, it is invalid to the extent it infringes on the academic freedom rights of university faculty.[18] Accordingly, we reverse'the judgment of the district court.

REVERSED

. Appellees named George Allen, then Governor of Virginia, as defendant. Subsequently, James S. Gilmore, III was elected Governor and was substituted as a party.

. Another provision of the Act defines “agency” and “information infra-structure”:
“Agency” means any agency, authority, board, department, division, commission, institution, institution of higher education, bureau, or like governmental entity of the Commonwealth, except the Department of State Police.
"Information infrastructure” means telecommunications, cable, and computer networks and includes the Internet, the World Wide Web, Usenet, bulletin board systems, online systems, and telephone networks.
Va.Code Ann. § 2.1-804 (emphasis omitted).

. Section 18.2-390 provides in pertinent part:
(2) "Nudity” means a state of undress so as to expose the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered or uncovered male genitals in a discernibly turgid state.
(3) "Sexual conduct” means actual or explicitly, simulated acts of masturbation, homosexuality, sexual intercourse, or physical contact in an act of apparent sexual stimulation or gratification with a persons clothed or unclothed genitals, pubic area, buttocks or, if such be female, breast.
(4) "Sexual excitement” means the condition of human male or female genitals when in a state of sexual stimulation or arousal.
(5)“Sadomasochistic abuse” means actual or explicitly simulated flagellation or torture by or upon a person who is nude or clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.
Va.Code Ann. § 18.2-390(2) to -390(5) (Mi-chie 1996) (emphasis omitted).

. In June 1997, a machine shop supervisor in the Physics Department at the College of William and Mary requested approval under the Act to research ndn-work-related issues concerning his disability. An administration official determined that prior approval was not necessary to access such materials.

. When a public employee's speech as a private citizen does not touch upon a matter of public concern, that speech is not "totally beyond the protection' of the First Amendment,” but "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency.” Connick, 461 U.S. at 147, 103 S.Ct. 1684.

. In this respect, restrictions on speech by public employees in their capacity as employees are analogous to restrictions on government-funded speech. For example, in Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the Court rejected an • argument that regulations prohibiting abortion counseling in a federally funded project violated the First Amendment rights of the staff of clinics accepting federal funds, reasoning that "[t]he employees' freedom of expression is limited during the time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority." Rust, 500 U.S. at 199, 111 S.Ct. 1759. In both situations-public employee speech and government-funded speech-the government is entitled to control the content of the speech because it has, in a meaningful sense, "purchased" the speech at issue through a grant of funding or payment of a salary. The limits of government control are similar in both types of cases, as well: Just as the government as provider of funds cannot dictate the content of speech made outside the confines of the funded program, see id. at 198, 111 S.Ct. 1759, the government as employer is restricted in its ability to regulate the speech of its employees when they speak not as public employees, but as private citizens on matters of public concern.
The insistence of Judge Wilkinson and Judge Murnaghan that a public employee is entitled to First Amendment protection for speech made in the course of his employment duties creates a fundamental and unnecessary schism between government-employee speech cases and government-funding cases. Under their respective analyses, a public employee would possess a First Amendment right to challenge his employer's directions regarding, for example, the preparation and con-tent of a report, while the same directions issued with respect to a report prepared pursuant to a grant of funding would not be subject to a First Amendment challenge.

. Judge Wilkinson writes as though he believes that professors possess a special constitutional right of academic freedom not enjoyed by other citizens. However, his statement that he applies the Pickering analysis solely to professors merely because "the statute's application to academic inquiry" provides "a useful illustration," post at 427, might indicate that he actually believes that they do not. If one reads his opinion this way, then he could be understood to believe that all public employees, not just professors, have First Amendment interests in speech made in the course of their employment duties-a concession, even if tacit, that completely undermines the arguments and analysis that he undertakes in his opinion.
Judge Wilkinson attempts to blunt the force of any such concession by claiming that he is addressing an "as applied" challenge by Appellees. See post at 427 n. 1. This attempt must fail for the simple reason that none of the Appellees have ever sought permission to access any materials on the Internet pursuant to the terms of the Act. See Lawline v. American Bar Ass'n, 956 F.2d 1378, 1386 (7th Cir.1992) (holding that an "as applied" challenge was improper when the provision had not yet been applied to the plaintiffs); National Commodity & Barter Ass'n v. United States, 951 F.2d 1172, 1175 (10th Cir.1991) (same). Moreover, the text of Judge Wilkinson's concurrence-which addresses the constitutionality of the statute as a whole, rather than with respect to any particular application-makes clear that he is in fact responding to Appel-lees' facial challenge.

. For ease of reference, we will refer to public institutions of higher learning generally as "universities.” This designation includes neither private institutions of higher learning nor public and private primary and secondary schools, as constitutional considerations applicable to such institutions are not pertinent to this appeal.
Although we discuss Appellees’ argument regarding academic freedom as applying to professors, we note that in their brief Appel-lees asserted that "[a]cademic freedom embraces not only professors but [also] the librarians, research assistants, and other staff without whom they cannot effectively function.” Brief of the Appellees at 22. And, at oral argument Appellees went so far as to suggest that the Act infringes the academic freedom of any state employee who engages in "intellectual work” analogous to the work of a professor. Of course, our determination, set forth below, that the Act does not violate any right of academic freedom possessed by university professors obviates the need to consider whether such a right could extend beyond professors. We feel compelled to note, however, the virtually limitless nature of Ap-pellees' suggestion. Research is, by its very nature, an "intellectual” pursuit. Thus, any state employee who conducts work-related research on sexually explicit topics on the Internet — i.e., any state employee covered by the Act — arguably would possess a constitutional right of academic freedom. We have little doubt that even the most vigorous proponent of an individual right of academic freedom would not contend that the right extends so far.

. Appellees assert that the Act infringes on academic freedom by hindering professors' ability to perform their employment duties, particularly teaching and research. The facts alleged in the complaint illustrate the type of restrictions with which Appellees are primarily concerned. Melvin I. Urofsky, the lead plaintiff in the district court, alleged that he had declined to assign an online research project on indecency law because he feared he would be unable to verify his students’ work without violating the Act. Appellee Terry L. Meyers contended that he is affected by the Act because his ability to access Virginia's database to research sexually explicit poetry in connection with his study of Victorian poets- is restricted by the policy. Appellee Paul Smith’s website has been censored as a result of the Act. And, appellees Dana Heller, Bernard H. Levin, and Brian J. Delaney maintained that they were hesitant to continue their Internet research of various aspects of human sexuality.

. The AAUP was not concerned with interference from the federal or state governments, *411 which at that time "largely refrained from any involvement in internal university affairs.” Byrne, supra, at 273; see Metzger, supra, at 1277-79.

. This freedom from lay interference, however, did not mean that academics were immune from the professional judgments of their peers. See Byrne, supra, at 277-78.

. In view of this history, we do not doubt that, as a matter of professional practice, university professors in fact possess the type of academic freedom asserted by Appellees. Indeed, the claim of an academic institution to status as a "university” may fairly be said to depend upon the extent to which its faculty members are allowed to pursue knowledge free of external constraints. See Metzger, supra, at 1279 (explaining that the authors of the 1915 AAUP report believed "that any academic institution that restrict[ed] the intellectual freedom of its professors ... cease[d] to be a true university”). Were it not so, advances in learning surely would be hindered in a manner harmful to the university as an institution and to society at large. However, Appellees fail to appreciate that the wisdom of a given practice as a matter of policy does not give the practice constitutional status. See Minnesota State Bd. for Community Colleges v. Knight, 465 U.S. 271, 288, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984) (concluding that "[1] acuity involvement in academic governance has much to recommend it as a matter of academic policy, but it finds no basis in the Constitution”).
Additionally, we note that we are not here called upon to decide the wisdom of the Act as a matter of policy. That an enactment may be utterly unnecessary, or even profoundly unwise, does not affect its validity as a matter of constitutional law.

.Irrespective of the validity of this claim as a matter of constitutional law, we note that the argument raises the specter of a constitutional right enjoyed by only a limited class of citizens. See David M. Rabban, Functional Analysis of "Individual” and “Institutional” Academic Freedom Under the First Amendment, 53 Law & Contemp. Probs. 221, 238 (1990). Indeed, the audacity of Appellees' claim is revealed by its potential impact in this litigation. If Appellees are correct that the First Amendment provides special protection to academic speakers, then a professor would be constitutionally entitled to conduct a research project on sexual fetishes while a state-employed psychologist could constitutionally be precluded from accessing the very same materials. Such a result is manifestly at odds with a constitutional system premised on equality.

. Justice Frankfurter’s reasoning, if controlling, would dictate that we uphold the Act on the basis that it does not infringe the academic freedom of the university. As explained infra note 17, the Act places with the university authority to approve or disapprove access to sexually explicit materials on corn-puters owned or leased by the state. Because the Act does not subject university decision-making to outside interference by the state, the Act would pass constitutional muster under Justice Frankfurter’s understanding of academic freedom.

.Interestingly, several concurring justices criticized the discussion of academic freedom in the majority opinion. Justice Black rejected the discussion altogether:
I am ... not ready to hold that a person hired to teach school children takes with him into the classroom a constitutional right to teach sociological, economic, political, or religious subjects that the school's managers do not want discussed.... I question whether it is absolutely certain, as the Court's opinion indicates, that "academic freedom” permits a teacher to breach his contractual agreement to teach only the subjects designated by the school authorities who hired him.
Id. at 113-14, 89 S.Ct. 266 (Black, J., concurring). Justice Harlan disassociated himself from the discussion, which he found unnecessary and likely to lead to confusion. See id. at 115, 89 S.Ct. 266 (Harlan, J., concurring). Justice Stewart, while not using the term "academic freedom,” attempted to limit the right discussed by the majority. See id. at 115-16, 89 S.Ct. 266 (Stewart, J., concurring in the result) (noting that "[t]he States are most assuredly free to choose their own curricu-lums for their own schools,” but rejecting the notion that a State could constitutionally punish a teacher for mentioning the existence of a prohibited subject (internal quotation marks omitted)).

. Justice Brennan's omission of academic freedom from his majority opinion in Edwards is particularly noteworthy in light of his subsequent dissent in Knight, in which he argued that university faculty possess a constitutional right of academic freedom to participate in institutional policymaking. See Knight, 465 U.S. at 295-300, 104 S.Ct. 1058 (Brennan, J., dissenting). Arguably, Justice Brennan believed that while faculty members were constitutionally entitled to participate in curricular decisions, they did not enjoy constitutional protection for rejecting the selected curriculum in favor of their own.

. In reaching this conclusion, we note that the Act places the authority to approve or disapprove research projects with the agency, here the university-. Thus, the Act leaves decisions concerning subjects of faculty research in the hands of the institution. And, while a denial of an application under the Act based upon a refusal to approve a particular research project might raise genuine questions — perhaps even constitutional ones — concerning the extent of the authority of a university to control the work of its faculty, such questions are not presented here.

. Our conclusion that the Act does not infringe on protected speech is dispositive of Appellees claim that the Act is overbroad. See Boos v. Barry, 485 U.S. 312, 331, 108 S.Ct. 1157, 99 L.Ed.2d 333, (1988) (recognizing that a regulation that “does not reach a substantial amount of constitutionally protected” speech cannot be overbroad). Further, the Act is not unconstitutionally vague because it gives a “person of ordinary intelligence a reasonable opportunity to know what is prohibited.” Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).