**DeComa LOVE–LANE, Plaintiff,**

**v.**

**Donald MARTIN, individually and in his official capacity as Superintendent of the Winston–Salem/Forsyth County Schools, and the Winston–Salem Forsyth County Board of Education, Defendants.**

**No. 1:99CV00735.**

United States District Court, M.D. North Carolina.

March 26, 2002.

568

J. Griffin Morgan, Robert M. Elliot, Elliot Pishko Gelbin & Morgan, P.A., Winston-Salem, NC, for plaintiff.

M. Daniel McGinn, Brooks Pierce McLendon Humphrey, Greensboro, NC, for defendants.

### MEMORANDUM OPINION

OSTEEN, District Judge.

Plaintiff DeComa Love–Lane filed this action against Dr. Donald Martin, Superintendent of the Winston–Salem/Forsyth County Schools ("Martin") and the Winston–Salem/Forsyth County Board of Education ("Board") on August 26, 1999. Plaintiff, who is black, alleges in her Amended Complaint that Defendants discriminated against her on the basis of her race and denied Plaintiff's rights to free speech, equal protection, and due process of law, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981, 42 U.S.C. § 1983, the U.S.Constitution, and the North Carolina Constitution.

This matter is now before the court on Defendants' Motion for Summary Judgment. For reasons set forth in this opinion, Defendants' Motion for Summary Judgment will be granted.

### I.  FACTUAL BACKGROUND

Plaintiff was hired by the Winston–Salem/Forsyth County Schools as a teacher in 1974. After 14 years as a teacher, Plaintiff was promoted to assistant principal in 1988. Plaintiff worked in this capacity for three years before being assigned as assistant principal at Lewisville Elementary School ("Lewisville") in 1995.

In her first year at Lewisville, 1995–96, Plaintiff enjoyed a satisfactory working relationship with the principal, Ms. Brenda Blanchfield, and earned a superior evaluation at the end of the year. However, during the following school year, 1996–97, the conflicts giving rise to this litigation began to develop. Plaintiff began to complain to various teachers and administrators about their treatment of students at Lewisville. Much of her concern focused on the use of the so-called "Time–Out Room," a room for students who needed to be temporarily removed from the classroom due to behavior problems.[1] Plaintiff

---

1. The Time–Out Room was the result of months of planning and input from teachers, administrators, and parents. Designed as an alternative to formal disciplinary measures, such as suspension, the Time–Out Room was intended to correct disruptive behavior in a

alleged that arbitrary disciplinary practices among teachers had led to a disproportionate number of black and poor white students being sent to the Time–Out Room, often for minor infractions.

Plaintiff expressed her disapproval of these allegedly discriminatory practices in a very direct and abrupt manner at staff meetings and other school settings. Following one of the staff meetings at which Plaintiff had voiced her opposition to the Time–Out Room and the teachers who used it, a number of teachers complained to Blanchfield that Plaintiff had called them "unprofessional." Additionally, Plaintiff refused to fulfill her administrative duties with regard to the Time–Out Room.[2] When the Time–Out Room coordinator called Plaintiff for assistance in dealing with a disruptive student, Plaintiff sometimes did not respond to the request at all, or if she did come to the Time–Out Room, did not attempt to correct the disruptive student's behavior.

Plaintiff's relationships with Blanchfield and the faculty at Lewisville suffered as a result of these conflicts. In an effort to improve these relationships, the assistant superintendent in charge of Lewisville at that time, Ron Montaquila, conducted several meetings with Plaintiff and Blanchfield during the course of the school year to address Plaintiff's communication skills. Plaintiff refused to accept any constructive criticism and denied that she had a communication problem. The assistant superintendent related these impasses to Superintendent Martin.

Martin began meeting with Plaintiff and Blanchfield late in the 1996–97 school year in an attempt to improve communication. Martin observed that Plaintiff frequently voiced disagreement with Blanchfield in a disrespectful manner and refused to follow her instructions even on relatively minor matters.[3] Martin attempted to counsel Plaintiff and Blanchfield at these conferences on how to improve their working relationship.

In the spring of 1997, Blanchfield issued Plaintiff's year-end evaluation. Although most of the ratings were high, in the area of communication Blanchfield rated Plaintiff below the superior level. Blanchfield explained to Plaintiff that the teachers found her style of communication condescending and insensitive. Plaintiff became upset and disputed Blanchfield's assessment, threatening to file a grievance. She told Martin that Blanchfield was simply reacting to Plaintiff's tendency to speak out on racial issues. She requested a transfer, which was denied.

Around the same time, Plaintiff's administrator contract was coming up for renewal. Despite the fact that she had given Plaintiff a below-superior rating for communication, Blanchfield initially recommended to Martin that Plaintiff receive a three-year contract renewal. When Martin objected, citing Plaintiff's communication problems, Blanchfield changed her recommendation to a two-year renewal. Blanchfield also requested that Plaintiff no longer be assigned to Lewisville.

On the last day of school before the 1997 summer recess, Plaintiff was involved in a

---

constructive manner. Written procedures and guidelines governed the operation of the room.

**2.** Plaintiff, as assistant principal, was required to assist the Time–Out Room coordinator, when needed.

**3.** For example, at one meeting, Plaintiff spent a substantial amount of time arguing with Blanchfield over where she had instructed Plaintiff to stand during bus loading. Blanchfield had instructed Plaintiff to stand outside; Plaintiff wished to stand inside.

heated confrontation with a teacher, Ms. Angie Anderson, in the hallway near Plaintiff's office. Both Plaintiff and Ms. Anderson reported the confrontation to Montaquila, each alleging that the other had used profanity. Blanchfield investigated the incident and concluded that both Anderson and Plaintiff had acted inappropriately and used profanity and thus deserved reprimands. After reviewing Blanchfield's investigation, Montaquila agreed. Plaintiff, however, objected to the reprimand, and the matter was referred to the human resources manager, David Fairall. After reviewing the investigation, Fairall concluded that reprimands for both Anderson and Plaintiff were proper.

In response, Plaintiff filed a formal grievance, alleging that she was being reprimanded because she had reported incidents and practices at Lewisville which she believed were racially discriminatory. A second investigation into the Anderson incident was completed by John Siskind, a paralegal with the school district. Siskind determined that Blanchfield's investigation had been fair and affirmed her decision that both Anderson and Plaintiff deserved reprimands.

Near the end of the grievance process, in the fall of 1997, Martin met once again with Plaintiff and Blanchfield and outlined his expectations for the coming year. Martin emphasized that Plaintiff needed to work effectively with Blanchfield. In a memorandum dated October 27, 1997, Martin clearly warned Plaintiff that if she did not rebuild a working relationship with Blanchfield and respect the principal's authority, she would no longer have a future as an administrator within the school district.

Despite Martin's efforts, the 1997–98 school year was marked by further conflicts involving Plaintiff. Plaintiff disagreed with several of Blanchfield's decisions and instructions regarding a re-allocation of responsibility among herself, Plaintiff, and another assistant principal. Additionally, in early 1998, a group of fifth-grade teachers under Plaintiff's supervision approached Blanchfield, detailing numerous communication problems with Plaintiff and requesting a different supervisor. The teachers related that they felt Plaintiff had undermined their relationships with parents and students by frequently making decisions without consulting them, changing previous decisions without informing them, and accusing them of lying. When Blanchfield denied their request, the teachers took their concerns directly to Martin and asked him to intervene on their behalf.

Throughout the 1997–98 school year, Amanda Bell, the assistant superintendent over elementary schools, also met with Plaintiff and Blanchfield in an effort to smooth their working relations. Bell noted that Plaintiff expressed herself in an unprofessional and disrespectful manner in these meetings and consistently refused to accept constructive criticism. She reported the outcome of these meetings to Martin.

At the end of the 1997–98 school year, Blanchfield's evaluation of Plaintiff was much lower than her previous evaluations. Before releasing the evaluation to Plaintiff, Blanchfield provided it to Bell and Martin for their review. After reviewing the evaluation, Martin concluded that Plaintiff had failed to meet his expectations as outlined in his October 1997 memorandum. He decided to assign Plaintiff to a teaching position for the remainder of her contract term (at her assistant principal salary) and not to renew her contract. Martin based this decision on Plaintiff's evaluation, his discussions with Plaintiff and Blanchfield, his review of various documents from

Plaintiff and Blanchfield, the Anderson incident, his conversations with Assistant Superintendents Bell and Montaquila, and his conversations with the fifth-grade teachers. A letter explaining this decision was delivered to Plaintiff along with her final evaluation.

As part of his decision that Lewisville would be better off with new leadership for the 1997–98 school year, Martin encouraged Blanchfield to take an administrative position at the school district's Central Office. Blanchfield did so, taking a pay cut as a result.

Plaintiff filed another formal grievance in response to her reassignment to a teaching position. A three-member panel of the school board heard the grievance on August 4, 1998. Both Plaintiff and the school system were represented by counsel, who, along with the parties, made statements to the panel. After considering the evidence before it, the panel affirmed Martin's decision by a vote of two to one.

Because the decision was not unanimous, Plaintiff exercised her right to have her grievance heard before the full Board. After reviewing the record of the panel hearing, the audio recording of the panel hearing, and arguments from both attorneys, the Board voted on June 29, 1999, to affirm the decision of the panel.

During the course of her employment with Winston–Salem/Forsyth County Schools as an assistant principal, Plaintiff also applied for a number of principal positions. The procedure employed to select candidates for an opening involved a team composed of two teachers from the school with the opening, the assistant superintendent over the grade level with the opening, two members of the Board, and a human resource representative. The team first performed an initial screening process, during which it interviewed promising candidates. After the first round of interviews, the selection team picked three finalists for further interviews and the final selection. Martin did not participate in the interviewing process until after the finalists were selected.

Under this system, black applicants were selected as finalists for a number of positions for which Plaintiff applied. Plaintiff, however, was not selected as a finalist for any of the positions. Ultimately, black applicants were chosen to fill almost half of the principal positions for which Plaintiff applied.

## II. DISCUSSION

### A. *Standard of Review*

Summary judgment is appropriate when the pleadings and other submissions show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A mere scintilla of evidence supporting plaintiff's claims is insufficient to overcome a motion for summary judgment; there must be enough evidence for a reasonable jury to find for plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### B. *Title VII and § 1981 Claims*

Plaintiff alleges that Defendants discriminated against her on the basis of her race by denying her applications for principal positions, denying her requests for a transfer, failing to renew her administra-

tor contract, and demoting her from an administrative position to a teaching position, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981.

■ The court notes as a preliminary matter that Plaintiff names both Martin and the Board in her claims for relief under Title VII. However, it is well-established that Congress intended for the Title VII remedial scheme to apply only to employers, not individual supervisors, such as Martin. *See Lissau v. Southern Food Serv.,* 159 F.3d 177, 181 (4th Cir.1998). Thus, Plaintiff's claim against Martin in his individual capacity will be dismissed. Moreover, Plaintiff's claim against Martin in his official capacity as superintendent actually constitutes a claim against the school district itself, of which he is an agent. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Because Plaintiff has asserted a cognizable claim against the Board, as the representative body of the school district, Plaintiff's claim against Martin in his official capacity is redundant and will be dismissed. *See Ramsey v. Schauble,* 141 F.Supp.2d 584, 591 (W.D.N.C.2001).

■ Claims for employment discrimination under both Title VII and § 1981 are evaluated using the burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989), *superseded in part by* the Civil Rights Act of 1991. Under this scheme, Plaintiff must first establish a prima facie case of discrimination.

*See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Only tangible, adverse employment actions may serve as the basis of a prima facie case of discrimination. *See Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999).[4] Such actions typically result from "ultimate employment decisions," such as hiring, discharging, compensation, and promotion. *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981).

If Plaintiff succeeds in establishing a prima facie case, the burden then shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their actions. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If Defendants do so, the "presumption of discrimination drops out of the picture," and Plaintiff must prove that the legitimate, nondiscriminatory reasons offered by Defendants to explain their actions were merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *see also St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993) (noting that "[i]t is not enough ... to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination").

Plaintiff has cited three adverse employment actions by Defendants which she claims were racially discriminatory: 1) failing to promote her to principal or transfer her to another position; 2) failing to renew her administrator contract; and 3) reassigning her to a teaching position. Because Plaintiff's contract non-renewal and subsequent reassignment essentially stemmed from a single action, they will be discussed jointly.

---

**4.** As the Fourth Circuit noted in *Boone,* "Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment." *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999).

#### 1. *Failure to promote or transfer*

■ In order to establish a prima facie case of discriminatory failure to promote, Plaintiff must prove that 1) she is a member of a protected class; 2) she applied for the position in question; 3) she was qualified for the position; and 4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *See Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994).

Plaintiff, a black woman, is a member of a protected class. Moreover, the evidence has established that she applied for a number of principal positions, both before and after Martin became superintendent of schools. Plaintiff also has presented limited evidence of her qualifications for these positions, primarily in the form of evaluations from two principals she worked under in the past recommending that she be promoted to principal. However, Plaintiff admits in her response brief to Defendants' summary judgment motion that the evidence on her failure to promote claim is "incomplete," citing a pending discovery motion. (Pl.'s Br.Resp.Defs.' Mot. Summ.J. at 18.)[5] Nevertheless, Plaintiff does present the court with the following summary of her argument in a footnote without any citations to the record: 1) Prior to Martin becoming superintendent, Plaintiff received "several" interviews for principal positions; yet 2) during Martin's tenure, Plaintiff has received "but three" interviews; and 3) Plaintiff has never been awarded a principalship. (*Id.* at 18 n. 6.)

■ These facts, without more, fall short of what might constitute circumstances giving rise to an inference of unlawful discrimination. *See Carter,* 33 F.3d at 458. Plaintiff has presented no facts tending to show that only people outside of her class were selected for principal positions, or that persons less-qualified than she were chosen. To the contrary, the uncontroverted evidence presented by Defendants shows that almost half of the positions for which Plaintiff applied were eventually awarded to black applicants. Moreover, from 1997 onwards, black applicants were chosen for five out of seven principal positions. The court finds no evidence supporting an inference of unlawful discrimination. Consequently, the court finds that Plaintiff has failed to establish a prima facie case on her failure to promote claim.

■ Plaintiff's "failure to transfer" claim is not actionable under Title VII because it does not constitute an adverse employment action. *See Boone,* 178 F.3d at 256 (only discrimination as to ultimate employment decisions such as hiring, granting leave, firing, promotion, and compensation constitute adverse actions). Plaintiff has cited no legal support to the contrary. As a result, her claim based on failure to transfer will be dismissed.

#### 2. *Reassignment/Non-renewal of Administrator Contract*

■ To establish her prima facie case that Defendants' decision not to renew her administrator contract and reassign her to a teaching position was discriminatory, Plaintiff must prove that 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) at the time of the action, she was "performing at a satisfactory level and meeting [her] employer's legitimate expectations"; and 4) she was replaced by someone outside her

5. Plaintiff's Motion to Compel, filed December 22, 2000, was denied by the magistrate judge on February 28, 2001, approximately one month after Plaintiff's response brief was filed with the court. The magistrate judge's decision was affirmed by order of this court on April 27, 2001.

protected class following the action. *Murphy v. Danzig,* 64 F.Supp.2d 519, 522–23 (E.D.N.C.1999) (citing *Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1228 (4th Cir.1998)).

■ As with Plaintiff's failure to promote claim, Plaintiff must overcome the hurdle of proving that she has suffered an adverse employment action before she can advance this theory. *See Boone,* 178 F.3d at 256. While non-renewal of a contract, standing alone, might constitute an adverse action under *Boone, see* 178 F.3d at 256, reassignment to a new job could be characterized as a neutral or even advantageous action, depending on the circumstances. In order to prove that her reassignment was in fact an adverse action under the circumstances, Plaintiff must prove that her reassignment resulted in lower pay, involved less responsibility, or required a "lesser degree of skill" than her previous assignment. *Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 799 (10th Cir.1993), *overruled on other grounds by Buchanan v. Sherrill,* 51 F.3d 227 (10th Cir.1995); *see also Boone,* 178 F.3d at 256 (reassignment must have detrimental effect on employee to be actionable).

In the present case, it is significant that following Plaintiff's reassignment, her pay remained at the assistant principal level for the remainder of her contract term. Thus, she did not suffer any adverse financial consequences as a result of the reassignment. Admittedly, Plaintiff no longer held an administrative role, but this evidence alone does not necessarily indicate that Plaintiff's job as a teacher involved less responsibility, only that it involved responsibility of a non-supervisory kind. Moreover, Plaintiff has submitted no evidence that her teaching position involved a "lesser degree of skill." The court's duty at the summary judgment stage of the proceedings, however, is to draw all reasonable inferences in favor of Plaintiff, the non-moving party. *See Edell & Assocs. v. Law Offices of Peter G. Angelos,* 264 F.3d 424, 435 (4th Cir.2001). Therefore, despite the shortfalls in this element of Plaintiff's prima facie case, the court will infer from the evidence Plaintiff has presented (namely, that Plaintiff was deprived of her supervisory responsibilities) that Plaintiff's non-renewal and subsequent reassignment were an adverse action for purposes of her prima facie case.

■ Moving to the third element of Plaintiff's prima facie case, Plaintiff must next establish that at the time of her reassignment to a teaching position, she was performing her duties as assistant principal satisfactorily and meeting her employer's legitimate expectations. *See Murphy,* 64 F.Supp.2d at 522–23. It is here that Plaintiff's case falls short, as the evidence clearly demonstrates that Plaintiff was *not* performing satisfactorily prior to her reassignment. Beginning in the 1996–97 school year, Plaintiff was involved in several clashes with teachers and Blanchfield regarding the Time–Out Room and was uncooperative when her assistance was needed in the Time–Out Room. Plaintiff's communication style was variously described as intimidating, abrupt, overly-aggressive, disrespectful, and unprofessional. Plaintiff refused to accept the constructive criticism offered by the assistant superintendent and Blanchfield with regard to improving her communication style and her relationships with teachers.

Not surprisingly, Plaintiff received a "below-superior" rating in the area of communication on her year-end evaluation from Blanchfield. When Blanchfield explained the basis for her rating, Plaintiff became very upset, refused to accept responsibility for the rating and threatened to file a grievance. Moreover, Plaintiff

told Martin that Blanchfield had only given her the rating because she had spoken out on "racial issues."

Plaintiff was also involved in a heated confrontation with a teacher in the spring of 1997, in which both parties used profanity and behaved in an unprofessional and inappropriate manner. Plaintiff was formally reprimanded for this incident.[6]

Additional evidence of Plaintiff's unsatisfactory performance is apparent from the record of the 1997–98 school year. Plaintiff continued to spar with Blanchfield on various policy issues, including the Time–Out Room and a redistribution of responsibility between Plaintiff, Blanchfield, and another assistant principal. Additionally, in January 1998, a group of fifth-grade teachers became so dissatisfied with Plaintiff's supervision that they requested that Blanchfield assign them a new supervisor. When Blanchfield declined to do so, the teachers appealed to Martin, specifically describing their dissatisfaction with Plaintiff's communication and supervision.

The assistant superintendent responsible for Lewisville conducted several more meetings between Plaintiff and Blanchfield during the 1997–98 school year in an effort to resolve their conflicts. At these meetings, the assistant principal witnessed Plaintiff behave in an inappropriate and disrespectful manner. As during the previous year's meetings, Plaintiff refused to accept constructive criticism.

Plaintiff's less than satisfactory performance was further reflected in a low evaluation from Blanchfield in the spring of 1998. On a six-level scale, Plaintiff received ratings in the bottom half of the scale for six of eleven "major function" areas in which she was evaluated. In the major function area entitled "Implementing the School Program," Plaintiff received an "At Standard" rating, with a note from Blanchfield that "She has not been effective in working with staff to address areas for their improvement." Plaintiff also received an "At Standard" rating in the area of "Evaluating and Remediating the School Program," with the note that she needed to provide feedback to the staff in a more timely manner. (Blanchfield Decl.Ex. 4.)

In the major function area of "Keeping Professionally Competent," Plaintiff received a "Below Standard" rating, with a notation that "DeComa resisted efforts to address improvement in communication and working relationships." Blanchfield gave Plaintiff an "At Standard" rating in the area of "Handling Disciplinary Procedures," observing that Plaintiff needed to develop better feedback to teachers with respect to discipline referrals and that some teachers felt that Plaintiff had "pitted" students against them. (*Id.*)

Blanchfield gave Plaintiff a "Below Standard" rating in the area of "Coordinating and Communicating the Schools [sic] Formal Structure," stating that Plaintiff had "resisted carrying out assigned tasks with a passive-aggressive response." In the area of "Assisting in Record Keeping," Plaintiff received an "At Standard" rating, with the note that she did not always follow through with the principal's directions as to how to complete tasks. In the area of "Facilitating Organizational Efficiency," Plaintiff received the lowest possible rating, "Unsatisfactory." Blanchfield noted here that there had been "numerous difficulties in dealing with staff," and that

---

6. Plaintiff objected to Blanchfield's decision to reprimand her, precipitating an independent review of Blanchfield's investigation by the human resource manager. When the human resource manager had reviewed the incident and determined that a reprimand was indeed appropriate, Plaintiff filed a formal grievance. After a second full review, the decision to reprimand Plaintiff was once more affirmed.

Plaintiff "frequently tries to circumvent principal in dealing with parents and staff." Blanchfield offered the following comments at the end of Plaintiff's evaluation:

Although DeComa has the intelligence, knowledge, and skills to be an administrator, she continues to be ineffective in developing good open communications or quality working relationships with staff. She resists any feedback/suggestions for improvement. She has not been effective as an Asst. Principal at Lewisville this year.

(*Id.*)

This evidence clearly establishes that Plaintiff was not performing satisfactorily in her position as assistant principal at the time of her reassignment. *See Murphy,* 64 F.Supp.2d at 522–23. Moreover, Plaintiff also failed to meet the legitimate expectations of her employer, despite the fact that these expectations were clearly communicated to Plaintiff. *See id.* Martin told Plaintiff in several conferences and an October 1997 memorandum that she needed to work effectively with Blanchfield in order to retain her position as an administrator. Martin told Plaintiff that she must demonstrate during the remainder of the 1997–98 school year that "she is able and willing to respect the authority of the principal and to rebuild that degree of trust that is necessary for her to function effectively as a school administrator." Martin went on to state,

If she is able to put the past behind her and rebuild a working relationship with Mrs. Blanchfield, she will have convinced me that she has a future as a school administrator with the WS/FCS.... In the event that [Plaintiff] is unwilling or unable to re-establish a working relationship with Mrs. Blanchfield, it will convince me that she does not have a future as an administrator

with the WS/FCS. Assuming that grounds do not occur for her dismissal or demotion under the provisions of G.S. § 115C–325 during the remainder of her contract's term, WS/FCS will honor the remainder of her two year contract but she will be encouraged to return to the classroom or to seek employment elsewhere.

(Martin Decl.Ex. 2.) Despite these clear warnings, Plaintiff continued to have conflicts with Blanchfield and others throughout the 1997–98 school year, resulting in her low evaluation as detailed above and eventual reassignment.

Due to the overwhelming evidence that Plaintiff was not performing satisfactorily and was not meeting her employer's legitimate expectations as an assistant principal, the court finds that Plaintiff has not established a prima facie case of discrimination with respect to her contract non-renewal and reassignment.

Plaintiff has failed to establish a prima facie case on any of her Title VII/ § 1981 claims. Therefore, summary judgment will be granted to Defendants on each of these claims.

### C. *Constitutional Claims*

In addition to her Title VII/ § 1981 claims, Plaintiff has brought claims under 42 U.S.C. § 1983 and state law, asserting that Defendants 1) denied her right to free speech and retaliated against her for exercising that right, in violation of the First Amendment of the U.S. Constitution and the North Carolina Constitution; 2) discriminated against her because of her race and her opposition to allegedly racially discriminatory policies, in violation of the equal protection clause of the Fourteenth Amendment of the U.S.Constitution and Art. I, § 19 of the North Carolina Constitution; and 3) denied Plaintiff her right to procedural due process of law, also in vio-

lation of the Fourteenth Amendment and Art. I, § 19 of the North Carolina Constitution.

1. Federal Constitutional Claims— School Board

In order for a local government entity, such as a school board, to be held liable under 42 U.S.C. § 1983, Plaintiff must prove that the Board's official policy or custom caused the violation of Plaintiff's rights. *See Pembaur v. Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *see also Riddick v. School Bd. of the City of Portsmouth,* 238 F.3d 518, 524 (4th Cir.2000) (municipality's deliberate conduct must be the moving force behind alleged violation). The requirement that the constitutional violation result from official policy or custom was intended "to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur,* 475 U.S. at 479, 106 S.Ct. at 1298. A local government entity may not be held liable for the acts of its employees on a respondeat superior basis. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

While official policy is often embodied in formal, written rules or statements, action taken by an authorized decision-maker may also constitute official policy. *See Pembaur,* 475 U.S. at 480–81, 106 S.Ct. at 1299. An authorized decision-maker is one who "possesses final authority to establish municipal policy with respect to the action ordered." 475 U.S. at 481, 106 S.Ct. at 1299. Only action taken by a final policymaking authority may lead to municipal liability. *Id.*

These principles are important in the instant case because the Board's involvement with Plaintiff was limited. Pursuant to its final review authority over the superintendent, the Board (first through a panel, then by plenary review) approved Martin's decision to reassign Plaintiff to a teaching position and not renew her administrator contract. Only these actions, through which the Board exercised its final policymaking authority, may be the basis for Board liability. *See id.* The Board cannot be held liable for the discretionary conduct of Martin and Blanchfield over which it did not retain final review authority, as there is no respondeat superior liability under § 1983. *See Monell,* 436 U.S. at 691, 98 S.Ct. at 2036; *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).

a. First Amendment Claim

To evaluate Plaintiff's claim that the Board's reassignment and non-renewal of her administrator contract violated her rights under the First Amendment, the court is tasked with balancing the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)).

A public employee must prove several elements to establish a claim based on deprivation of free speech rights. First, Plaintiff's speech must involve a matter of public concern. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 351–52 (4th Cir.2000). This is dependent on the content, form, and context of the speech at issue. *See* 218 F.3d at 352. Second, "the employee's interest

in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace." *Id.* Next, Plaintiff must prove that she was deprived of a valuable government benefit or suffered adverse action tending to chill her free speech rights. *See id.* Finally, Plaintiff must establish causation—that her protected speech was a substantial factor in her employer's decision to take the adverse action. *See id.*

██ If the employee's speech cannot fairly be characterized as touching upon a matter of public concern, the inquiry into the employee's discharge or other alleged retaliation will end there. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690 (absent expression constituting matter of public concern, public officials should enjoy "wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment"). However, even where the employee's speech does relate to a matter of public interest, it is critical to determine whether the speech is made primarily in the speaker's capacity as citizen or the speaker's capacity as employee. *See Urofsky v. Gilmore,* 216 F.3d 401, 407 (4th Cir.2000). The Supreme Court has chosen the former as more worthy of constitutional protection, in recognition of the reality that public employees often deal with matters of great public concern in the course of their employment. To grant all public employees constitutional protection for speech made in their capacity as employees would give them "a First Amendment right to dictate to the state how they will do their jobs." *Id.; see also Connick,* 461 U.S. at 149, 103 S.Ct. at 1691 (First Amendment does not mandate that public office be operated as "roundtable for employee complaints over internal office affairs").

██ In this case, Plaintiff's speech encompassed not only just disciplinary practices and the use of the Time–Out Room at Lewisville, but also her disputes with her supervisor, Blanchfield. While the court grants that effective discipline within the public schools could potentially be a matter of public concern, Plaintiff's personal difficulties in getting along with her supervisor do not constitute a matter of public concern. Moreover, the court is not convinced that any of Plaintiff's speech was expressed in a capacity other than that of public employee. Plaintiff, a school administrator, was questioning the mode and manner in which students were disciplined. She expressed her views to those whom she believed were responsible for the practices at issue (presumably with the goal of changing those practices); namely, Blanchfield and the teachers who used the Time–Out Room. Moreover, she expressed her views in school forums—in faculty meetings and in conversations with her supervisor, Blanchfield. Using the context and form of Plaintiff's expression as a guidepost, *see Goldstein,* 218 F.3d at 352, the court finds that Plaintiff's speech was more in her capacity as a public school administrator than as a private citizen.

██ Even if the court had found that Plaintiff's speech was uttered in her capacity as a private citizen, Plaintiff has not demonstrated that her interest in First Amendment expression outweighs her employer's interest in the efficient operation of the public schools. The court has received substantial evidence of the disruption and destruction of working relationships caused by Plaintiff's expression, some of it by Plaintiff's own admission. Plaintiff antagonized and insulted those who used the Time–Out Room and refused to assist the Time–Out Room coordinator in its administration. She failed to develop effective working relationships with other staff, driving some to appeal to the superintendent to replace her. She used

profanity in an inappropriate confrontation with a teacher. She resisted feedback or constructive criticism. She repeatedly challenged her principal's judgment. She refused to rebuild an effective working relationship with Blanchfield, even after being clearly warned by Martin that she must do so or risk losing her job.[7] Defendants' interest in maintaining the effective functioning of Lewisville by removing Plaintiff, a disruptive and dividing influence, far outweighs Plaintiff's interest in First Amendment expression. *See Derrickson v. Board of Educ. of St. Louis,* 738 F.2d 351, 353 (8th Cir.1984) (noting that First Amendment did not shield teacher from adverse action resulting from teacher's "inability to work with his superiors, peers, and students in a conciliatory manner"). To hold otherwise would be to allow Plaintiff, in effect, to dictate to her employer how she should be allowed to perform her job. *See Urofsky,* 216 F.3d at 407.

As the Supreme Court stated in *Connick,* "The limited First Amendment interest involved here does not require that [petitioner] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." 461 U.S. at 154, 103 S.Ct. at 1694. Similarly, when it became clear to Defendants that Plaintiff's presence as an administrator at Lewisville was disrupting the school, undermining Blanchfield's authority, and destroying working relationships with teachers, their decision to reassign Plaintiff and not renew her contract did not offend the First Amendment.

Defendants' motion for summary judgment as to Plaintiff's § 1983 claim for violation of her First Amendment rights will be granted.

### b. Equal Protection Claim

■■■ Plaintiff also alleges that the Board violated her Fourteenth Amendment right to equal protection under the law by discriminating against her on the basis of race. Equal protection claims of this nature, where the plaintiff is a "class of one," require proof that the plaintiff was intentionally treated differently than others similarly situated and there was no rational basis for the difference in treatment. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000). The same requirements for a prima facie case brought under Title VII or § 1981 also apply to race discrimination claims brought under § 1983 and are evaluated using the *McDonnell–Douglas* burden-shifting framework. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 2746 n. 1, 125 L.Ed.2d 407 (1993); *Richmond v. Board of Regents,* 957 F.2d 595, 598 (8th Cir.1992).

Because Plaintiff failed to establish her racial discrimination claims under Title VII or § 1981, it is unnecessary for the court to repeat its analysis here under the identical framework. Defendants' motion for summary judgment will be granted as to Plaintiff's § 1983 equal protection claim.

### c. Procedural Due Process Claim

■■■ Plaintiff additionally asserts that the Board violated her Fourteenth Amendment right to procedural due process. To be entitled to constitutional due process, Plaintiff must first establish that she has a property interest in continued employment

---

7. To be fair, Martin acknowledged that Blanchfield was not blameless in this conflict. As a result, he encouraged Blanchfield to step down as principal at Lewisville and take a new job at the district's central office. Blanchfield complied with Martin's request, even though it meant taking a pay cut.

with the school district under state law. *See Royster v. Board of Trustees,* 774 F.2d 618, 621 (4th Cir.1985); *Peace v. Employment Sec. Comm'n of N.C.,* 349 N.C. 315, 321, 507 S.E.2d 272, 277 (1998). To demonstrate such an interest under North Carolina law, an employee must point to a contract, state statute or local ordinance providing a right to continued employment. *See · Peace,* 349 N.C. at 321, 507 S.E.2d at 277.

▮ However, even if an employee is protected by a valid employment contract, he or she does not have a constitutionally protected interest in any particular job. As the Fourth Circuit has observed, "[N]o authority . . . supports the proposition that a property interest in the continued expectation of public employment includes the right to physically possess a job, in defiance of the stated desire of the employer." *Huang v. Board of Governors,* 902 F.2d 1134, 1141 (4th Cir.1990) (quoting *Royster,* 774 F.2d at 621). Rather, the constitutional interest of an employee working under contract is "satisfied by payment of the full compensation due under the contract." *Id.*

▮ Plaintiff did have an employment contract as an assistant principal at the time of her adverse action. However, Plaintiff had no constitutionally protected interest in .any particular job with the school district. Moreover, the Board, in affirming Martin's decision to reassign Plaintiff to a . teaching position, did not reduce Plaintiff's salary to that of a teacher but honored her salary as an assistant principal for the remainder of her contract.

Plaintiff received the full compensation she was due under the contract. Thus, the Board's decision did not deprive Plaintiff of any constitutionally protected property interest.

▮ Even if Plaintiff were constitutionally entitled to due process before being reassigned despite the fact she suffered no reduction in pay, the evidence demonstrates that she was in fact accorded a full measure of procedural due process. Plaintiff received notice and an opportunity to be heard at a meaningful time and in a meaningful manner, which are the essential elements of due process required by the Constitution. *See Peace,* 349 N.C. at 322, 507 S.E.2d at 278. Plaintiff received written notice of Martin's decision and was allowed to appeal Martin's decision to a panel of three Board members. *See* N.C.Gen.Stat. §§ 115C–287.1(d), 115C–45(c). Plaintiff was represented by counsel in this proceeding, at which she presented evidence and was allowed along with her attorney to make a statement to the panel. Following the panel's 2–1 vote to affirm Martin's decision, Plaintiff was allowed to appeal the panel's decision to the full Board for review. *See* § 115C–287.1(d). The Board reviewed both the written and oral transcript of the panel's proceedings and voted to affirm the panel's decision.[8] These procedures, determined to be constitutionally adequate by the courts of North Carolina, *see Cooper v. Board of Educ.,* 135 N.C.App. 200, 205–06, 519 S.E.2d 536, 540 (1999), were far more than what Plaintiff was constitutionally due and provide no grounds for her to complain.[9]

---

**8.** Although Plaintiff was entitled to judicial review of this decision under state law, *see* N.C.Gen.Stat. §§ 115C–287.1(d), 115C–45(c), she did not avail herself of this option.

**9.** Plaintiff, nevertheless, maintains that she was also entitled to a "plan of assistance"

under school board regulations. Under this policy, "career status" employees who were experiencing performance difficulties were entitled to a "plan of assistance" designed to help them back on track. However, Plaintiff was not a career status employee as defined under North Carolina law and thus is not

Plaintiff has not established that any policy, custom, or final decision of the Board resulted in any constitutional violations she has alleged. Consequently, the court will grant Defendants' motion for summary judgment as to each of Plaintiff's § 1983 claims against the Board.

### 2. Federal Constitutional Claims—Dr. Donald Martin

Plaintiff also asserts federal constitutional claims against Martin in both his official and individual capacities. However, the claims which Plaintiff asserts against Martin in his official capacity actually constitute claims against the entity of which he is an agent, the school district. *See Kentucky*, 473 U.S. at 165–66, 105 S.Ct. at 3105. Because Plaintiff has also asserted claims against the school district by suing the Board, the claims against Martin in his official capacity are redundant with those claims and will be dismissed. *See Hicks v. Halifax County Bd. of Educ.*, 93 F.Supp.2d 649, 667 (E.D.N.C. 1999).

■■■■ As to the claims against Martin in his individual capacity, Martin has raised the defense of qualified immunity. Under the doctrine of qualified immunity, public officials are shielded from liability for civil damages to the extent their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In determining whether Martin's conduct violated a clearly established right, the focus "is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *DiMeglio v. Haines*, 45 F.3d 790, 803 (4th Cir.1995).

Thus, asserting a violation of the "right to due process," without greater particularity, cannot overcome the defense; the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 804.

■■■■ In light of the court's discussion of Plaintiff's First Amendment claims against the Board, *supra*, it is apparent that Plaintiff's rights with regard to free expression in the course of her public employment are anything but clearly established. The contours of those rights depend first on whether Plaintiff's expression dealt with a matter of public concern or a primarily employment-related matter, and whether Plaintiff's speech was uttered in her capacity as a public employee or in her capacity as a private citizen.

■■■■ These issues, standing alone, are difficult legal issues to adjudicate. However, even if Martin could readily ascertain that Plaintiff was speaking as a private citizen on a matter of public concern, he would still have to undertake the difficult balancing test set forth in *Pickering*, i.e., whether Plaintiff's free expression rights were nevertheless outweighed by the school district's interest in the efficient operation of its public schools. Due to the complexity of this inquiry, the court cannot find that Martin, or a reasonable person in his position, would have known that his conduct violated Plaintiff's clearly established rights. As the court in *DiMeglio* forecasted, "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined." 45 F.3d at 806 (quoting *Connick*, 461 U.S. at 150, 103

entitled to a plan of assistance. *See* N.C.Gen. Stat. § 115C–325(c)(3).

S.Ct. at 1691–92); *see also Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.1986) (noting that a constitutional rule requiring that competing interests be balanced is "so fact dependent that the 'law' can rarely be considered 'clearly established' ").

Moreover, Plaintiff has failed to offer any closely analogous cases tending to prove that Plaintiff's rights in this regard were clearly established. In response to Martin's assertion of qualified immunity, Plaintiff offers the following:

> Martin cannot establish his defense of qualified immunity as a matter of law. Love–Lane's rights were established at the time she exercised them. *Hall v. Marion School District No. 2,* 31 F.3d 183 (4th Cir.1994). Martin was aware that Love–Lane was complaining of racial practices, and that Blanchfield resented Love–Lane's objections. Love–Lane Aff., ¶ 41. Nevertheless, as argued above, Martin refused to transfer Love–Lane and left her destiny to the whims of her superior.

(Pl.'s Br.Resp. Defs.' Mot.Summ.J. at 17.) This statement is utterly insufficient to prove that Plaintiff's rights to free expression at the expense of the effective functioning of the school were clearly established. The *Hall* case, moreover, is not clearly analogous to Plaintiff's case. The plaintiff in *Hall,* a teacher, wrote numerous letters to the editor concerning mismanagement of taxpayers' funds by the Board that were published in several newspapers. She also made several FOIA requests for information concerning expenditures by school officials, and wrote numerous letters to state and federal public officials about her complaints with the school system. *See Hall v. Marion Sch. Dist. No. 2,* 31 F.3d 183, 186–88 (4th Cir. 1994). Plaintiff's expression, by contrast, occurred in school forums and primarily comprised complaints about her supervisor's judgment and the day to day functioning of the school.

With regard to Plaintiff's equal protection claim, Plaintiff's right not to be treated adversely on the basis of her race is clearly established, and a reasonable school official would be aware of this right. Under the circumstances, however, Martin would have had no reason to believe that his conduct violated that right. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. There is no evidence suggesting that Martin reassigned Plaintiff or decided not to renew her contract on the basis of her race. Rather, as is clear from the analysis of Plaintiff's Title VII claim, he did so for legitimate, nondiscriminatory reasons— Plaintiff's inability to work effectively with others, defiance of authority, disruptive behavior, and poor final evaluation. In short, Martin's conduct did not violate Plaintiff's rights under the equal protection clause.

Similarly, Martin is entitled to qualified immunity on Plaintiff's procedural due process claim. As detailed above in the analysis of Plaintiff's due process claim against the Board, Plaintiff received a full measure of constitutional due process even though she was not constitutionally entitled to such process. While Plaintiff's right to procedural due process is clearly established at a general level, her entitlement to constitutional due process, even where she was accorded the full financial benefit of her contract, is not. In any event, it cannot be said that Martin violated Plaintiff's right to due process when he provided her advance written notice of his decision and complied with all relevant statutory provisions regarding Plaintiff's two grievance hearings, provisions which have been upheld as constitutionally sufficient. *See Cooper,* 135 N.C.App. at 205–06, 519 S.E.2d at 540.

The court finds that Martin is entitled to qualified immunity for each of Plaintiff's

federal constitutional claims. Consequently, the court will grant Defendants' motion for summary judgment as to each of these claims.

### 3. State Constitutional Claims

Claims asserted under the North Carolina Constitution may be asserted only against state officials acting in their official capacity, not in their individual capacity. *See DeWitt v. Mecklenburg County*, 73 F.Supp.2d 589, 605–06 (W.D.N.C. 1999) (citing *Corum v. University of North Carolina*, 330 N.C. 761, 788, 413 S.E.2d 276, 293 (1992)). Therefore, claims against Martin in his individual capacity will be dismissed.

Claims under the North Carolina Constitution for violation of Plaintiff's free speech rights are evaluated under the same rubric as claims brought under the First Amendment of the U.S.Constitution. *See id.* at 606 n. 12 (citing *State v. Petersilie*, 334 N.C. 169, 184, 432 S.E.2d 832, 841 (1993)). Because the court has already determined that Plaintiff's free speech rights under the Federal Constitution have not been violated by Defendants, Plaintiff's state constitutional free speech claim also fails.

Plaintiff's equal protection claim under the state constitution is also deficient. Under North Carolina law, a cause of action under the state constitution exists only in the absence of an adequate state remedy. *See Hughes v. Bedsole*, 48 F.3d 1376, 1383 n. 6 (4th Cir.1995). Plaintiff could have brought suit in state court as allowed under North Carolina General Statute § 115C–287.1(d) seeking review of the Board's decision. Because Plaintiff did not do so, she is barred from raising a state constitutional claim here.

Finally, Plaintiff's claim under the state constitution for violation of her procedural due process rights fails because Plaintiff has not established that she was deprived of a protected property right. *See* discussion of Plaintiff's federal claims at II. C(1)(c), *supra*.

Defendants' motion for summary judgment on Plaintiff's state constitutional claims against Martin in his official capacity and the Board will therefore be granted.

## III. CONCLUSION

For the reasons stated herein, the court will grant Defendants' Motion for Summary Judgment on each of Plaintiff's claims not already dismissed herein.

A judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.

### *JUDGMENT*

For the reasons stated in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment [24] is granted.