PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MICHAEL S. ADAMS,

*Plaintiff-Appellant,*

v.

THE TRUSTEES OF THE
UNIVERSITY OF NORTH CAROLINA-
WILMINGTON; M. TERRY COFFEY;
JEFF D. ETHERIDGE, JR.; CHARLES
D. EVANS; LEE BREWER GARRETT;
JOHN A. MCNEILL, JR.; WENDY F.
MURPHY; LINDA A. PEARCE; R.
ALLEN RIPPY, SR.; GEORGE M.
TEAGUE; KRISTA S. TILLMAN;
DENNIS T. WORLEY; KATHERINE L.
GURGAINUS, all in their individual
and official capacities; ROSEMARY
DEPAOLO, individually and in her
official capacity as Chancellor of
the University of North Carolina-
Wilmington; DAVID P. CORDLE,
individually and in his official
capacity as Dean of the College of
Arts and Sciences at the
University of North Carolina-
Wilmington; KIMBERLY J. COOK,
individually and in her official
capacity as Chair of the
Department of Sociology and
Criminal Justice at the University
of North Carolina-Wilmington;

No. 10-1413

DIANE LEVY, individually and in
her official capacity as former
interim Chair of the Department of
Criminology and Sociology at the
University of North Carolina-
Wilmington,

   *Defendants-Appellees.*

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS; THOMAS
JEFFERSON CENTER FOR THE
PROTECTION OF FREE EXPRESSION;
FOUNDATION FOR INDIVIDUAL
RIGHTS IN EDUCATION,

   *Amici Supporting Appellant.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Malcolm J. Howard, Senior District Judge.
(7:07-cv-00064-H)

Argued: January 26, 2011

Decided: April 6, 2011

Before TRAXLER, Chief Judge, and
NIEMEYER and AGEE, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published
opinion. Judge Agee wrote the opinion, in which Chief Judge
Traxler and Judge Niemeyer joined.

## COUNSEL

**ARGUED:** David Austin French, ALLIANCE DEFENSE FUND, Columbia, Tennessee, for Appellant. Thomas J. Ziko, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Joseph J. Martins, Travis C. Barham, ALLIANCE DEFENSE FUND, Columbia, Tennessee; Robert M. Schmidt, PATRICK HENRY JUSTICE CENTER, Laurinburg, North Carolina, for Appellant. Roy Cooper, North Carolina Attorney General, John P. Scherer II, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. Martha S. West, General Counsel, Rachel Levinson, AMERICAN ASSOCIATION OF UNI-VERSITY PROFESSORS, Washington, D.C.; Robert M. O'Neil, J. Joshua Wheeler, THE THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRES-SION, Charlottesville, Virginia, for Amici Supporting Appellant.

## OPINION

AGEE, Circuit Judge:

Michael S. Adams appeals from the judgment of the District Court for the Eastern District of North Carolina awarding summary judgment to the sixteen defendants (collectively "Defendants"), each of whom is affiliated with Adams' employer, the University of North Carolina-Wilmington ("UNCW" or "the University").[1] Adams brought three claims

---

[1]The defendants are UNCW's Chancellor, Rosemary DePaolo; twelve members of UNCW's Board of Trustees; the Dean of the College of Arts and Sciences, Dr. David Cordle; the former interim Chair of the Department, Dr. Diane Levy; and the current Chair of the Department, Dr. Kimberly Cook. The defendants were each named in their individual and official capacities.

against the Defendants alleging religious and speech-based discrimination, as well as retaliation, in relation to the decision not to promote him to the position of full professor at UNCW. The district court granted the Defendants' motion for summary judgment on all claims, concluding they were entitled to judgment as a matter of law. For the reasons set forth below, we affirm in part, and reverse and remand in part the judgment of the district court.

## I.   Factual and Procedural Background

### A.

In 1993, UNCW, a public university of the state of North Carolina, hired Adams as an assistant professor of criminology in the Department of Sociology and Criminal Justice ("the Department"). Over the next five years Adams earned strong teaching evaluations from both peers and students. During this period, he received two faculty awards, published several articles, and was involved in numerous service-related activities at UNCW and in the larger community. In 1998, Adams was promoted to the tenured position of associate professor.

In 2000, Adams became a Christian, a conversion that transformed not only his religious beliefs, but also his ideological views. After his conversion, Adams became increasingly vocal about various political and social issues that arose within both the UNCW community and society at large. He became a regular columnist for Townhall.com and appeared on radio and televisions broadcasts as a commentator. In 2004, he published a book entitled *Welcome to the Ivory Tower of Babel: Confessions of a Conservative College Professor*, a collection of previously-published columns and new material. Throughout this time, Adams continued to receive strong teaching reviews from students and faculty.

As Adams cultivated his conservative standing beyond the UNCW campus, some tension evolved within the UNCW

community. Some UNCW employees indicated discomfort with Adams' views and his manner of expressing them. From time to time, UNCW officials fielded complaints from members of the Board of Trustees, the faculty and staff, and the general public about Adams' public expressions of his views. Correspondence about the complaints indicates that while UNCW officials, some of whom are named Defendants, occasionally expressed personal disagreement with the content of Adams' columns, they uniformly recognized that the First Amendment and principles of academic freedom protected Adams' writings and other expressions of his views. At one point, defendant Levy, then interim chair of the Department, suggested that Adams alter the tone of his speech to be less "'caustic'" and more "'cerebral'" "like William F. Buckley" in order to "'make things a whole lot more pleasant around the office.'" (J.A. 43.)

In 2004, Adams applied for promotion to the position of full professor. At UNCW, the promotion process is self-initiated, meaning that Adams could apply at any time and there was not an advertised "opening" for the position. The UNCW Faculty Handbook ("the Handbook") described the criteria for a promotion. Applicants are "evaluated in four areas: teaching, research or artistic achievement, service, and scholarship and professional development" and an applicant's record "should demonstrate evidence of steady growth and maturation." (J.A. 649.) Moreover, "excellence in teaching and in artistic achievement or research . . . rank highest among the criteria for tenure and promotion decisions." (J.A. 649.) The Handbook specifically notes that "meeting any quantifiable measures provided does not guarantee the award of tenure or promotion." (J.A. 649-50.) Rather, the applicant must "provide persuasive documentation that qualitative criteria as well as any quantifiable accomplishments have been met." (J.A. 649.)

The Handbook also contains specific explanations of the requirements for promotion to full professor. For the teaching

component, "excellence is expected" and "will be reflected in teaching performance and content and in teaching activities outside the classroom," as well as in the sharing of teaching skills. (J.A. 651.) With respect to research accomplishment, faculty are "expected to demonstrate a tangible record of professionally-reviewed substantial contributions to one's discipline" including "more tangible evidence of accomplishment than that of the associate professor rank, [although] the difference in artistic and research expectations for a full professor is not solely quantitative. Greater quality, maturity, significance and originality . . . are expected at this rank." (J.A. 651.) For the service component, the criterion is as generally described above, except that candidates "must show evidence of leadership in . . . various service areas." (J.A. 653.) "Scholarship and professional development are continuing expectations of every faculty member," and are demonstrated "primarily in growth and improvement in teaching, research accomplishments[,] . . . and service contributions." (J.A. 653.)

Adams' application included standard information regarding his education and professional history, as well as his academic status at UNCW, including courses taught, information about advisees, committees, and boards he had served on at UNCW, the results of recent peer evaluations, and honors and awards he had earned during his time at UNCW. Adams also listed ten authored or co-authored "[r]efereed publications (including juried or peer-reviewed . . . writings)" that had been published since 1992, and one additional article of this type that had been accepted for publication. (J.A. 155-56.)

Relevant to the issues in this case, Adams' application also cited some of the external writings and appearances he had made since his conversion experience in 2000. Adams also listed non-refereed publications as part of his research and scholarship, including his book *Welcome to the Ivory Tower of Babel* and another book he had co-authored that was under consideration for publication, *Indoctri-Nation: How universi-*

*ties are destroying America.*[2] Under the "Service" heading, J.A. 162, in the "Optional subcategories" subheading, J.A. 163, Adams included the following:

> Please note that my informal advising to student organizations, especially Christian groups, is also a prominent part of my service activities. . . .
>
> Also note that I use my national column (published on TownHall.com and sometimes in Human Events) to help Christian groups fight discrimination. One prominent example is a Florida college that tried to ban a Christian group from showing The Passion of the Christ. My column revealed that the school had falsely claimed to have a ban on showing "R" rated movies. When I discovered they had showed secular "R" rated movies in the past, the school reversed its position. I routinely expose such cases of anti-religious bigotry on our campuses.

(J.A. 164.) And under the "other" subheading for "Service," J.A. 165, Adams referred to being "an activist in the campus free speech movement[, which has] generated a good deal of publicity for UNCW," and he included a positive quote about himself from "nationally syndicated talk show host Neal Boortz." (J.A. 165.) As part of his community service, Adams listed numerous speeches on "Academic Freedom" as well as conservative issues, which he had given to conservative organizations and at universities, as well as radio and television interviews. We will refer collectively to the foregoing materials listed in his application, which were not primarily devoted to purely academic subjects in his field, as Adams' "speech." It is this speech which is a primary focus of Adams' claims.

---

[2]Although mentioned in his application, a copy of *Welcome to the Ivory Tower of Babel* was not included with the application.

Under standard UNCW procedure, Dr. Cook, the Department Chair, after consultation with senior Department faculty, was responsible for determining whether to recommend Adams for promotion to full professor. If she did not recommend him, the application process ended. If she did recommend him, then the process would continue to the next level of consideration.

Upon receiving Adams' application, Cook forwarded it to the senior Department faculty, asking for their initial impressions prior to a meeting at which they would discuss the application more formally. Cook then compiled the individual comments into a "document summarizing the major themes raised in the initial senior faculty review" with the goal of creating "a document for discussion in the meeting of senior faculty." (J.A. 513.) Participants in the meeting that followed, some of whom voted in favor of Adams' promotion and some of whom did not, uniformly described the process as "professional" and lacking rancor or hostility toward either the content of Adams' speech or his political or religious beliefs. To the extent that Adams' columns and book were discussed, the conversation centered on how to evaluate the materials for "scholarliness" because they were not peer-reviewed or traditional academic writing related to his academic discipline. In the end, the senior faculty voted 7-2 to oppose Adams' promotion. Dr. Cook undertook her own review, but in part because she looks for "overwhelming support from the senior faculty," which she found lacking, she agreed with their decision, and did not recommend Adams for promotion to full professor. (J.A. 514.)

Following this decision, Adams asked Dr. Cook for a written explanation. Her draft response noted that Adams had an "adequate" record though there were concerns as to each criteria for promotion, and that "the area of research" was "inadequate to merit promotion to Professor at this time" because Adams' scholarly productivity was "too thin." (J.A. 704.) Dr. Cook subsequently edited this explanation. In the correspon-

dence she eventually sent to Adams, Dr. Cook explained that the decision "was based exclusively on the promotion application and supplementary materials you submitted and [Cook's] consultation with the senior faculty in accordance with existing UNCW . . . policies and procedures." (J.A. 181.) She indicated an "overwhelming consensus" of the senior faculty did not support the promotion and found "the lack of support from the senior faculty" provided "compelling" evidence that Adams' "record [did] not merit promotion to professor at this time." (J.A. 181.)

When asked about certain differences between her initial draft and the final explanation, Dr. Cook explained that while Adams' teaching and service were "adequate," that did not mean that they were sufficient to "equal the significant standards required for promotion" and that what she meant was that while there were concerns in all three criteria, "the areas of concern in [Adams'] teaching or service record would not have kept him from promotion" had his research record been stronger. (J.A. 519.) When Adams requested an additional explanation, Dr. Cook expressed reservations that "distilling the reasons for denial into one sentence (as you requested earlier) runs the risk of being incomplete." (J.A. 184.) She reiterated the criteria for the rank of professor and concluded:

> The overriding concern regarding your record to date is in the area of scholarly research productivity. The scholarly criterion for promotion to professor requires that a "tangible record of research" is accomplished to merit promotion. Since your last promotion in 1998 [to tenured associate professor], your scholarly productivity in peer-reviewed venues does not demonstrate a cumulative "tangible" pattern of academic expertise in sociology, criminology and/or criminal justice to merit promotion to professor at this time. The teaching criterion for promotion to professor requires one to have documented "distinguished accomplishment" in that professional

arena. While your teaching record is the strongest aspect of your application for promotion thus far, it does not satisfy this standard. The service criterion requires a "significant record" of service . . . . Your service record to the university and to the academic disciplines . . . is judged to be insufficient for promotion.

(J.A. 184-85.)

Additional facts relevant to each argument on appeal are discussed in context below as we review the district court's holding as to each claim.

B.

After receiving a right-to-sue letter from the EEOC, Adams filed his complaint in the district court asserting claims under 42 U.S.C. § 1983 for First Amendment Retaliation and Viewpoint Discrimination, Denial of Equal Protection under the Fourteenth Amendment, and religious discrimination under Title VII.[3] The complaint named the Defendants in their individual and official capacities.

The Defendants first moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion as to monetary claims against the Defendants in their official capacities and as to Adams' Title VII claims for religious discrimination against the Defendants in their individual capacities.[4]

Following discovery, the Defendants moved for summary judgment. The district court granted the motion and entered judgment in favor of the Defendants as to all claims. Adams

---

[3]The operative pleading is Adams' first amended verified complaint, which we will refer to as the "complaint."

[4]Adams does not contest any aspect of that order.

noted a timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.   Standard of Review

We review an award of summary judgment de novo. *Hawk-spere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003). Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe the evidence in the light most favorable to Adams, the party opposing the Defendants' summary judgment motion, and draw all reasonable inferences in his favor. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004) (en banc).

## III.   Overview

Adams' complaint alleged, in essence, three causes of action: (1) religious discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII"); (2) viewpoint discrimination and retaliation for protected expression, in violation of the First Amendment, pursuant to 42 U.S.C. § 1983; and (3) denial of equal protection, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment. On appeal, Adams argues the grant of summary judgment to the Defendants on each of these claims was erroneous either because material facts were in dispute or the district court made substantive errors of law in analyzing the claims.

Before undertaking our analysis, it is important to underscore the context in which we consider Adams' claims. Following the Supreme Court's directive, courts have been reluctant

to trench on the prerogatives of state and local edu-
cational institutions [because of the courts'] respon-
sibility to safeguard their academic freedom, a
special concern of the First Amendment. If a federal
court is not the appropriate forum in which to review
the multitude of personnel decisions that are made
daily by public agencies, far less is it suited to evalu-
ate the substance of the multitude of academic deci-
sions that are made daily by faculty members of
public educational institutions — decisions that
require an expert evaluation of cumulative informa-
tion and [are] not readily adapted to the procedural
tools of judicial or administrative decisionmaking.

*Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226
(1985) (internal citations and quotation marks omitted); *see
also Urofsky v. Gilmore*, 216 F.3d 401, 409-10, 412 (4th Cir.
2000) (en banc) (discussing Supreme Court jurisprudence
regarding "academic freedom," observing that it is a "term
that is often used, but little explained, by federal courts," and
noting that the Supreme Court has not established "a First
Amendment right of academic freedom that belongs to the
professor as an individual," but rather "to the extent [the
Supreme Court] has constitutionalized a right of academic
freedom at all, [it] appears to have recognized only an institu-
tional right of self-governance in academic affairs").

For this reason

[u]niversity employment cases have always created
a decisional dilemma for the courts. Unsure how to
evaluate the requirements for appointment, reappoin-
tment and tenure, and reluctant to interfere with the
subjective and scholarly judgments which are
involved, the courts have refused to impose their
judgment as to whether the aggrieved academician
should have been awarded the desired appointment
or promotion. Rather, the courts review has been

narrowly directed as to whether the appointment or promotion was denied because of a discriminatory reason.

*Smith v. Univ. of North Carolina*, 632 F.2d 316, 345-46 (4th Cir. 1980) (internal citations omitted). It is with this well-established understanding of the limited review courts may undertake in cases involving employment decisions of academic institutions that we consider Adams' claims.

## IV.    Title VII Claim

Adams asserted the Defendants violated Title VII's protection against religious discrimination by "subjecting [him] to numerous, intrusive, and harassing investigations, asking him to terminate his First Amendment activities, and refusing to promote him to full professor because of his outspoken Christian and conservative beliefs." (J.A. 51.) The district court granted summary judgment to the Defendants based on its conclusion that Adams had not brought forth direct or indirect evidence of religious discrimination. Viewing Adams' arguments as "surmises" and "conjecture," the court held Adams failed to produce any record evidence that reflected a discriminatory attitude which bore directly on the contested employment decision, as required under *Rhoads v. F.D.I.C.*, 257 F.3d 373 (4th Cir. 2001). (J.A. 1378.) Furthermore, the district court found Adams failed to establish a material factual dispute under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Adams contends on appeal that he produced direct and indirect evidence of religious discrimination that created a triable issue of fact as to the reason for denying him promotion to full professor. Adams points to his widely-known religious and conservative views and the senior faculty's comments about his publications as direct evidence that he was denied a promotion based on those views. As indirect evidence of discrimination, Adams asserts he was the only professor with

his credentials to be denied a promotion to full professor in the past twenty-five years. In addition, he cites idiosyncrasies and misrepresentations during the promotion decision process as evidence of pretext.

Title VII makes it "an unlawful practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). To prove his claim, Adams had to "demonstrate that [the Defendants] treated [him] differently than other employees because of [his] religious beliefs." *Chalmers v. Tulon Co.*, 101 F.3d 1012, 1017 (4th Cir. 1996) (emphasis omitted). Adams satisfies this "burden at the summary judgment stage if [he] establishes that [his] job performance was satisfactory and 'provides direct or indirect evidence' whose cumulative probative force supports a reasonable inference'" that the employment decision was discriminatory. *Id.* (quoting *Lawrence v. Mars, Inc.*, 955 F.2d 902, 905-06 (4th Cir. 1992); *see also Hill*, 354 F.3d at 284-85.

Having reviewed the record in the light most favorable to Adams, we agree with the district court that he failed to set forth direct evidence of religious discrimination. To do so, Adams was required to show that religion was a "motivating factor" in the decision not to promote him. *Hill*, 354 F.3d at 285 (quotation omitted). Adams did not make such a showing on this record, and his arguments demand pure speculation. There is simply no direct evidence that the Defendants treated Adams differently based on his religious beliefs.

We also conclude the district court properly held that Adams failed to satisfy his burden for proving discrimination using the burden-shifting analysis of *McDonnell Douglas*. To demonstrate a prima facie case of discrimination, Adams had to show that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse action, he was performing his job at a level that met his employer's legitimate expectations and was qualified for

the promotion; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination. *Taylor v. Va. Union Univ.*, 193 F.3d 219, 230 (4th Cir. 1999), *abrogated on other grounds as recognized by Hill*, 354 F.3d at 284. "If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. If the employer meets that burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks and citations omitted).

The district court found, and the Defendants do not contest, that Adams met the first two *McDonnell-Douglas* prongs. The district court assumed without deciding that Adams also satisfied the third prong and was qualified for promotion to full professor. Although the Defendants do contest this point, we will also assume Adams was qualified for promotion because the last *McDonnell-Douglas* prong is dispositive of Adams' claim.

The district court did not err in concluding Adams failed to satisfy the fourth prong of establishing his prima facie case – that he was denied a promotion under circumstances giving rise to an inference of unlawful discrimination. Adams contends such an inference arises from the fact that "he is the *only* Christian conservative in his Department" and "the *only* professor in the past twenty-five years to be denied the rank of full professor at the Department level with teaching awards and ten or more refereed publications on his application." (Appellant's Opening Br. 66.) As the district court observed, this argument fails in several respects. Although Adams contends he is the only "conservative Christian," his Title VII claim rests on evidence of religious discrimination rather than political or social ideology and Adams "forecasts no evidence that he is the [D]epartment's only Christian." (J.A. 1380.) Furthermore, Adams' comparison of his qualifications to

those of others in the Department cannot, by itself, meet his burden. There must be some additional tie to a religious motive for the decision not to promote him and Adams failed to make that showing. Although some of his writings contained religious content and were considered during the decisionmaking process, that fact, in and of itself, does not give rise to an inference of discrimination. Adams' conjecture links the two, but nothing more substantial does.

But even if we assume that Adams had established a prima facie case, the Defendants satisfied their burden to "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Cf. Hill*, 354 F.3d at 285. The Defendants offered numerous legitimate reasons for the decision not to promote Adams, including the small number of peer-reviewed single author publications since Adams' last promotion.

Consequently, even if the burden then shifted back to Adams to show pretext, we hold that he has failed to raise a genuine issue of material fact that the Defendants' explanation is purely pretextual. "A plaintiff alleging a failure to promote can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 259 (4th Cir. 2006). Due to the nature of Adams' promotion, *i.e.*, he was not competing against someone else who got the position, he cannot show he was more qualified than another applicant who was promoted. Adams posits instead that he was as qualified as other individuals who had previously been promoted to full professor. Adams' attempt to compare qualifications ignores "the inevitable element of subjectivity" involved in promotion decisions in the university setting. *See Smith*, 632 F.2d at 342. Subjectivity in such promotion decisions is permitted so long as it lacks discriminatory intent. *Id.* at 345-46 (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1156-57 (2d Cir. 1978) ("[T]he law does not require, in the first instance, that employment be rational, wise, or well-

considered—only that it be nondiscriminatory.")). Purely numerical comparisons are thus insufficient to demonstrate pretext in this context. *Id.* at 345 ("[S]ince professors are individuals and perform different roles within a department, it is difficult to compare the reasons for promoting one faculty member with the reasons for promoting or not promoting another.").

Importantly, in demonstrating the Defendants' decision was pretext, Adams had to prove "*both* that the reason was false, *and* that discrimination was the real reason." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (quotation omitted). Adams cannot rely on his "own assertions of discrimination[, which] in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989). In light of Adams' burden of proof, we find no error in the district court's determination that the record lacked evidence to support Adams' allegations of religious discrimination. Accordingly, we affirm the district court's grant of summary judgment to the Defendants on Adams' Title VII claim.

## V.   First Amendment Claims

Adams separately argues the district court erred in granting summary judgment to the Defendants on his First Amendment retaliation and viewpoint discrimination claims. To begin our examination of this argument, we review well-established principles that guide our analysis.

The First Amendment protects not only the affirmative right to speak, but also the "right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). While government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its employees'

speech and take action against them that would be unconstitutional if applied to the general public. *See City of San Diego v. Roe*, 543 U.S. 77, 80 (2004); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) ("[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."); *see also Urofsky*, 216 F.3d at 406 ("[T]he state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole.").

In *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court analyzed the competing interests at play between the public employee, "as a citizen, in commenting upon matters of public concern" and the government, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick*, 461 U.S. at 142 (quoting *Pickering*, 391 U.S. at 568). In *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998), we explained that *Pickering* and *Connick* balance those competing interests in the context of a claim for retaliation by requiring the court to determine:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's [adverse employment] decision.

157 F.3d at 277-78 ("the *McVey* test"); *see also Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 693-94 (4th Cir. 2007).

To avoid summary judgment on his retaliation and viewpoint discrimination claims, Adams was required to adduce

evidence sufficient to show material facts in dispute as to each of the three prongs of the *McVey* test. The district court, in granting summary judgment to the Defendants, considered only the first *McVey* prong, whether Adams' speech was that of "a citizen [speaking] upon a matter of public concern." The court made no ruling as to the other *McVey* factors. Accordingly, we examine whether the district court erred in awarding summary judgment based on the first *McVey* prong.

Citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006), for the proposition that "when a public employee makes a statement pursuant to his 'official duties,' he does not 'speak as a citizen,'" the district court observed that it "must focus not on the content of the speech but on the role the speaker occupied when he said it." (J.A. 1385.) The court then concluded that when Adams listed his columns, publications, and public appearances in his promotion application, he "implicit[ly] acknowledge[d] that they were expressions made pursuant to his professional duties—that he was acting as a faculty member when he said them." (J.A. 1385.) As a consequence, the district court concluded that Adams' speech was not protected by the First Amendment because Adams' "inclusion of the speech in his application for promotion trumped all earlier actions and marked his speech, at least for promotion purposes, as made pursuant to his official duties." (J.A. 1386.)

As we explain below, the district court misread *Garcetti*. The district court's decision rests on several fundamental errors including its holding that protected speech was converted into unprotected speech based on its use after the fact. In addition, the district court applied *Garcetti* without acknowledging, let alone addressing, the clear language in that opinion that casts doubt on whether the *Garcetti* analysis applies in the academic context of a public university. *See Garcetti*, 547 U.S. at 425. Nor did the district court take into

consideration the only Fourth Circuit case addressing a similar issue, *Lee*, 484 F.3d at 694 & n.11.[5]

A.

The district court's initial error lies in its conclusion that Adams' speech, which the Defendants agree was protected First Amendment speech when initially given, was converted into unprotected speech based on factors that came into play only after the protected speech was made. Although the district court framed the issue properly by noting it must focus "not on the content of the speech but on the role the speaker occupied when he said it," J.A. 1385, the court's subsequent analysis ignores the role Adams occupied when he "spoke." Instead, the court's basis for determining the First Amendment did not protect Adams' speech was Adams' subsequent inclusion of past protected speech as part of his promotion application. In effect, the district court held that Adams' speech in his columns, books, and commentaries, although undoubtedly protected speech when given, was somehow transformed into unprotected speech because Dr. Cook and others read the same items from a different perspective long after Adams' speech was uttered.

The district court cited no precedent for this determination, that protected speech can lose its First Amendment protected status based on a later reading of that speech. Although the Defendants understandably agree with the district court's holding, they also provide no precedent for the phenomenon of converting protected speech to unprotected speech after the fact. Nor does the district court's analysis find any support in *Garcetti*, which focused on the nature of the employee's speech at the time it was made. *See* 547 U.S. at 421-22. Nothing about listing the speech on Adams' promotion application

---

[5]*See infra* Part IV.B.

changed Adams' status when he spoke or the content of the speech when made.[6]

We do not agree with the district court's observation that its holding was required because otherwise it

> would allow those in [Adams'] position to place employers in a double bind: either neglect employee requests and refuse to look at material, fueling allegations of free speech violations grounded in the refusal; or consider the material, knowing that doing so will open them up, in the event of an adverse outcome, to claims of free speech violations for basing denials on protected speech.

(J.A. 1386.) This purported catch-22 is illusory. Adams' inclusion of the speech at issue as part of his application process asked the Defendants to consider it not according to the content qua speech, but as factoring into the sweeping requirements of scholarship and service necessary to support his promotion to full professor. The Defendants were not precluded from examining the materials for a permissible purpose using lawful criteria. At the same time, their review of those materials can be examined for an impermissible discriminatory use. This "bind" is no different than the commonplace consideration of criteria that govern all university employment decisions. It does not open the Defendants up to an insurmountable dilemma as misidentified by the district court.

Accordingly, we find the district court's conclusion that Adams' speech was converted from protected to unprotected speech to be error as a matter of law.

---

[6]For the reasons set forth in *infra* Parts IV.B and C, Adams' speech was entitled to First Amendment protection at the time it was initially made.

B.

We are also persuaded that *Garcetti* would not apply in the academic context of a public university as represented by the facts of this case. Our conclusion is based on the clear reservation of the issue in *Garcetti*, Fourth Circuit precedent, and the aspect of scholarship and teaching reflected by Adams' speech.

In *Garcetti*, the Supreme Court conducted a specific analysis associated with the first prong of the *McVey* test and the *Pickering-Connick* factors, to determine whether a public employee spoke as a citizen on a matter of public concern. The plaintiff, Ceballos, wrote a memorandum as part of his official duties as a deputy district attorney asserting various perceived inaccuracies in an affidavit used to obtain a search warrant in a pending criminal case. 547 U.S. 413-15. Ceballos' employer, the county district attorney's office, subsequently altered Ceballos' duties, and Ceballos sued alleging retaliation based on his memo. *Id.* at 415. The Supreme Court determined that Ceballos' claim failed because he was not speaking as a citizen when he wrote the memo. In so doing, the Court concluded, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22. Accordingly, the Supreme Court held the First Amendment does not "protect[ ] a government employee from discipline based on speech made pursuant to the employee's official duties." *Id.* at 413.

Toward the conclusion of its analysis, and in response to Justice Souter's dissent, the Supreme Court stated:

> There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not

fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.

*Id.* at 425. As other courts of appeals have noted, this caveat has left unclear the applicability of *Garcetti* in the context of "speech related to scholarship or teaching." *E.g.*, *Gorum v. Sessoms*, 561 F.3d 179, 186 & n.6 (3d Cir. 2009) (commenting on the uncertain implications of the Supreme Court's statement, citing law review articles discussing the dilemma, and comparing the Fourth Circuit's decision in *Lee* to the Seventh Circuit's decision in *Renken v. Gregory*, 541 F.3d 769 (7th Cir. 2008), which applied *Garcetti* in an academic setting).

The plain language of *Garcetti* thus explicitly left open the question of whether its principles apply in the academic genre where issues of "scholarship or teaching" are in play. We recognized this fact in *Lee*, the only Fourth Circuit case to discuss *Garcetti*'s applicability in this area:

> The Supreme Court in *Garcetti* held that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. The Court explicitly did not decide whether this analysis would apply in the same manner to a case involving speech related to teaching. Thus, we continue to apply the *Pickering-Connick* standard . . . to this appeal.

484 F.3d at 694 n.11 (citations and quotation omitted). Although *Lee* concerned a public high school teacher's First Amendment rights in the classroom, its basis for using the

*Pickering-Connick* analysis as opposed to *Garcetti* is equally
— if not more — valid in the public university setting, which
is the specific arena that concerned both the majority and the
dissent in *Garcetti*. Therefore, we are not compelled by *Garcetti* to extend its principles to the case at bar.

There may be instances in which a public university faculty
member's assigned duties include a specific role in declaring
or administering university policy, as opposed to scholarship
or teaching. In that circumstance, *Garcetti* may apply to the
specific instances of the faculty member's speech carrying out
those duties. However, that is clearly not the circumstance in
the case at bar. Defendants agree Adams' speech involves
scholarship and teaching; indeed, as we discuss below, that is
one of the reasons they say *Garcetti* should apply – because
UNCW paid Adams to be a scholar and a teacher regardless
of the setting for his work. But the scholarship and teaching
in this case, Adams' speech, was intended for and directed at
a national or international audience on issues of public importance unrelated to any of Adams' assigned teaching duties at
UNCW or any other terms of his employment found in the
record. Defendants concede none of Adams' speech was
undertaken at the direction of UNCW, paid for by UNCW, or
had any direct application to his UNCW duties.[7]

Applying *Garcetti* to the academic work of a public university faculty member under the facts of this case could place
beyond the reach of First Amendment protection many forms
of public speech or service a professor engaged in during his
employment. That would not appear to be what *Garcetti*
intended, nor is it consistent with our long-standing recognition that no individual loses his ability to speak as a private
citizen by virtue of public employment. In light of the above
factors, we will not apply *Garcetti* to the circumstances of this
case.

---

[7]Defendants agree independent third parties paid Adams for his columns, books, commentaries and speeches.

The Defendants nonetheless contend that because Adams was employed as an associate professor, and his position required him to engage in scholarship, research, and service to the community, Adams' speech constituted "statements made pursuant to [his] official duties." *Cf.*, *Garcetti*, 547 U.S. at 421. In other words, the Defendants argue Adams was employed to undertake his speech. This argument underscores the problem recognized by both the majority and the dissent in *Garcetti*, that "implicates additional constitutional interests that are not fully accounted for" when it comes to "expression related to academic scholarship or classroom instruction." *Id.* at 425; *see also id.* at 438 (Souter, J., dissenting) ("I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to . . . official duties.'"). Put simply, Adams' speech was not tied to any more specific or direct employee duty than the general concept that professors will engage in writing, public appearances, and service within their respective fields. For all the reasons discussed above, that thin thread is insufficient to render Adams' speech "pursuant to [his] official duties" as intended by *Garcetti*.

C.

Instead, a review of Adams' speech utilizes the *Pickering-Connick* analysis for determining whether it was that of a public employee, speaking as a citizen upon a matter of public concern. *See McVey*, 157 F.3d at 277-78. This analysis permits a nuanced consideration of the range of issues that arise in the unique genre of academia. Under that analysis, "[t]o determine whether speech involves a matter of public concern, we examine the content, form, and context of the speech at issue in light of the entire record." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004) (citing *Connick*, 461 U.S. at 147-48). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Id.* (citing *Connick*, 461 U.S. at

146); *see also City of San Diego*, 543 U.S. at 83-84 (observing that "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication"). For purposes of this inquiry, it does not matter "how interesting or important the subject of an employee's speech is," and "the place where the speech occurs is [also] irrelevant." *Urofsky*, 216 F.3d at 407.

Having reviewed the record, we conclude Adams' speech was clearly that of a citizen speaking on a matter of public concern. Adams' columns addressed topics such as academic freedom, civil rights, campus culture, sex, feminism, abortion, homosexuality, religion, and morality. Such topics plainly touched on issues of public, rather than private, concern. *E.g.*, *Connick*, 461 U.S. at 147-148 (holding that a questionnaire almost entirely addressing internal office matters involved a matter of private concern); *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 368 (4th Cir. 1998) (en banc) (holding that a teacher's selection of a play to be presented at a public school constituted a matter of private concern).

The Defendants' arguments to the contrary rest on the same fallacy engaged by the district court, and focus not on the nature of Adams' speech at the time it was made, but on his inclusion of those materials in the "private" context of his promotion application. Nothing in the district court's analysis or the Defendants' contentions rebut the conclusion that Adams' speech was that of "a citizen speaking on a matter of public concern."

## D.

For the aforementioned reasons, we hold that the district court erred as a matter of law in determining Adams failed to satisfy the first prong of the *McVey* test. We further hold that under the *Pickering-Adams* analysis, Adams has satisfied the first *McVey* prong as a matter of law. Because the district

court has never addressed whether the second and third prongs of the *McVey* test are met in this case, we remand the case for further proceedings relevant to that determination.[8]

As a final matter, we note that remand is appropriate despite the Defendants' alternative argument that the district court erred in denying their defense of qualified immunity. The Defendants assert they were entitled to immunity as to Adams' First Amendment claim because their conduct did not violate a "clearly established constitutional right" given the uncertain state of the law in the area of what protection should be afforded to public university teacher's speech following *Garcetti*.[9] We disagree. *Garcetti* provided an additional component to the *McVey* test and the *Pickering-Connick* analysis traditionally applied in assessing whether the First Amendment protects a public employee's speech. However, the underlying right Adams asserts the Defendants violated — that of a public employee to speak as a citizen on matters of public concern — is clearly established and something a reasonable person in the Defendants' position should have

---

[8]The district court also granted the Defendants summary judgment on what it identified as Adams' four retaliation claims that did not involve his promotion. Because the court's "official duties" analysis did not apply to the retaliation claims, the court found that those claims failed because Adams failed "to forecast evidence sufficient to withstand summary judgment on the *McVey* test's requirement of a causal nexus between the speech and any of the alleged retaliatory employment actions." (J.A. 1387.) Although Adams' opening brief mentioned the four purported retaliatory actions, he never addresses the court's dispositive finding as to those claims. Accordingly, Adams has abandoned those claims and we do not address them on appeal. *See* Fed. R. App. Pro. 28(a)(9)(A); *see also Rosenberger v. Rector & Visitors*, 18 F.3d 269, 276-77 (4th Cir. 1994), *rev'd on other grounds*, 515 U.S. 819 (1995).

[9]To determine whether the Defendants were entitled to immunity, the Court must (1) identify the right allegedly violated, (2) consider whether at the time of the alleged violation the right was clearly established, and (3) determine whether a reasonable person in the Defendants' position would have known that their actions violated that right. *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (en banc).

known was protected. As such, the Defendants are not entitled to qualified immunity, and the proper course is to remand Adams' claims for further consideration under the second and third prongs of the *McVey* test.

## VI.    Equal Protection

Adams lastly contends that the district court erred in granting the Defendants summary judgment on his Equal Protection claim. As noted, the district court concluded Adams failed to bring forth any evidence that the Defendants' actions were based on Adams' Christian beliefs or that any evidence forecast that he was treated "differently than a similarly situated professor on any other basis." (J.A. 1389.) Adams contends this was error because the evidence in the record creates a genuine issue of fact as to whether the Defendants discriminated against his conservative religious viewpoint in favor of faculty who expressed "left-leaning viewpoints." (Appellant's Opening Br. 70.)

Public employees are entitled to bring § 1983 actions asserting claims based on equal protection violations. *See Booth v. Maryland*, 327 F.3d 377, 382-83 (4th Cir. 2003). To succeed on such a claim, Adams was required to plead sufficient facts to "'demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Williams v. Hansen*, 326 F.3d 569, 576 (4th Cir. 2003) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). Having reviewed the record, we agree with the district court's conclusion that Adams' evidence creates no issue of disputed fact that the Defendants' decision to deny his promotion was the result of intentional or purposeful discrimination based on his religious beliefs, or that he was treated differently from others with whom he was similarly situated. As discussed in detail above, we are reluctant to revisit the "subjective and scholarly judgments" involved in university tenure and promotion decisions by

engaging in the sort of comparisons to other promotion decisions that Adams would have us undertake. *Cf. Smith*, 632 F.2d at 345-46. Accordingly, the district court did not err in granting the Defendants' motion for summary judgment on this claim.

## VII.

For the foregoing reasons, we reverse the district court's grant of summary judgment as to Adams' First Amendment claims of viewpoint discrimination and retaliation. We affirm the district court's grant of summary judgment on Adams' Title VII and Equal Protection claims. Accordingly, we remand this case for further proceedings consistent with this opinion as to the viewpoint discrimination and retaliation claims.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*